**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LAKEWOOD CONCRETE CORP., on behalf of itself and all others similarly situated, | |
| *Plaintiff*, | |
| v. | Case No. |
| SIKA AG; SIKA CORPORATION; CHRYSO, INC.; GCP APPLIED TECHNOLOGIES, INC.; COMPAGNIE DE SAINT-GOBAIN S.A.; SAINT- GOBAIN NORTH AMERICA; MASTER BUILDERS SOLUTIONS ADMIXTURES U.S., LLC; MASTER BUILDERS SOLUTIONS DEUTSCHLAND GMBH; CINVEN LTD.; CINVEN, INC.; THE EUCLID CHEMICAL COMPANY; RPM INTERNATIONAL INC.; and DOES 1-10, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

## CLASS ACTION COMPLAINT

Plaintiff Lakewood Concrete Corp ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to itself, and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to state antitrust, consumer protection, and unjust enrichment laws, as well claims for injunctive relief under the federal antitrust laws, and demands a trial by jury on all matters so triable. Plaintiff brings this action against Sika AG; Sika Corporation; Chryso, Inc.; GCP Applied Technologies, Inc.; Compagnie De Saint-Gobain S.A.; Saint-Gobain North America; Master Builders Solutions Admixtures U.S., LLC; Master Builders Solutions Deutschland GmbH; Cinven

Ltd.; Cinven, Inc.; The Euclid Chemical Company; RPM International Inc.; and Does 1-10 (collectively, "Defendants").

## I.     NATURE OF THE ACTION

1.     This lawsuit arises from Defendants' unlawful agreement to fix the prices for (a) concrete admixtures, (b) cement additives, and (c) admixtures for mortar (collectively, "CCAs"). CCAs, which can be either liquid or powdered, are added to concrete, cement, and mortar before or during the aggregate's mixing with water to give the finished product certain qualities, such as reducing the amount of water needed for the aggregate to set, reducing (or increasing) set time, reducing shrinkage, stabilizing or preventing cracking, and inhibiting corrosion.[1] Globally, the market for CCAs reached more than $18 billion in 2020[2] and $27 billion in 2022.[3]

2.     Defendants—Sika AG and Sika Corporation (collectively, "Sika"); Chryso, Inc. ("Chryso") and GCP Applied Technologies, Inc. ("GCP"), under the ownership and control of Compagnie de Saint-Gobain S.A. and Saint-Gobain North America ("Saint-Gobain," and with Chryso and GCP, "Saint-Gobain Group"); and Master Builders Solutions Admixtures U.S., LLC, ("MBSA"),  presently under the ownership and control of Master Builders Solutions Deutschland GmbH ("MBSD"), Cinven Ltd. and Cinven, Inc. ("Cinven. collectively "Master Builders Group"); and The Euclid Chemical Company ("Euclid"), under the ownership and control of RPM International Inc. ("RPM," and with Euclid, "Euclid Group")—manufacture and sell the

---

[1] The Constructor, 15 Types of Admixtures Used in Concrete, https://theconstructor.org/concrete/types-concrete-admixtures/5558/#:~:text=15.%20Coloring%20Admixtures%20%20%20Admixture%20%20,%20%20Green%20%203%20%20more%20rows%20

[2] Fortune Business  Insights, Concrete Admixtures Market Size (Jan. 2020), https://www.fortunebusinessinsights.com/concrete-admixtures-market-102832

[3] Global News Wire, Concrete Admixture Market is Projected to reach US $27.5 Billion with a Share of 36.1%, by 2032 (July 13, 2022), https://www.globenewswire.com/en/news-release/2022/07/13/2479255/0/en/Concrete-Admixture-Market-is-projected-to-reach-US-27-4-Billion-with-a-Share-of-36-1-by-2032-Future-Market-Insights-Inc.html

vast majority of CCAs sold in the United States. Defendants' unlawful agreement caused indirect purchasers of CCAs in the United States, including Plaintiff and the Class, to pay supra-competitive prices for CCAs sold by Defendants in the United States and its territories from the period beginning no later than May 11, 2018 and running through the date on which any Class herein is certified (the "Class Period"), in violation of state antitrust, consumer protection, and unjust enrichment laws, as well as Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). Defendants' scheme included both price increases and the imposition of surcharges on CCAs sold in the United States.

3.      Plaintiff and the Class first became aware of Defendants' unlawful scheme on October 17, 2023, when the European Commission ("EC") announced that it had, together with the United Kingdom's Competition and Markets Authority ("CMA") and the Turkish Competition Authority ("TCA"), carried out surprise antitrust inspections (also known as "dawn raids") of "companies active in the construction chemicals sector in several Member States."[4]

4.      That same day, the CMA released a statement that it had "launched an investigation . . . into suspected anti-competitive conduct relating to the supply of chemical admixtures and additives for use in concrete, cement, mortars and related construction products in the UK" and that its "investigation concern[ed] a suspected infringement or infringements of Chapter I [of the Competition Act of 1998] involving a number of suppliers of these chemicals and some industry bodies."[5] According to the CMA, Chapter I of the Competition Act of 1998 "prohibits agreements and concerted practices between undertakings (e.g., businesses) and decisions by associations of

---

[4] Press Release, European Comm'n, Commission Carries Out Unannounced Antitrust Inspections in the Construction Chemicals Sector (Oct. 17, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5061.

[5] Gov.UK, Suspected Anti-Competitive Conduct in Relation to the Supply of Chemicals for Use in the Construction Industry (Oct. 17, 2023), https://www.gov.uk/cma-cases/suspected-anti-competitive-conduct-in-relation-to-the-supply-of- chemicals-for-use-in-the-construction-industry.

undertakings (e.g., trade associations) which have as their object or effect the prevention, restriction or distortion of competition within the UK and which may affect trade within the UK."[6] That is, Chapter I of the Competition Act of 1998 is the UK's equivalent to Section 1 of the Sherman Act.

5.       Both the EC and CMA have confirmed that they are working with the United States Department of Justice's Antitrust Division ("DOJ") in connection with these dawn raids, thus indicating that the anticompetitive conduct in question also extended into this country.[7]

6.       Shortly after these global antitrust enforcers announced their dawn raids, it was revealed that Sika, Saint-Gobain, and Master Builders were targets in this global antitrust investigation.[8] It was also revealed that Sika and Saint-Gobain are cooperating with these global antitrust authorities,[9] and that at least Sika had been in contact with the DOJ.[10]

7.       The origins of Defendants' conspiracy can be traced to 2014, when Compagnie de Saint-Gobain S.A. launched a hostile takeover of Sika AG. [11] Over the next four years, Compagnie de Saint-Gobain S.A. attempted to consolidate its control of Sika AG, ultimately acquiring nearly a quarter of Sika AG's stock; however, on May 11, 2018, Compagnie de Saint-

---

[6] CMA, Guidance on the Application of the Chapter Prohibition in the Competition Act 1998 to Horizontal Agreements 6 (2023).

[7] Press Release, European Commission, Commission Carries Out Unannounced Antitrust Inspections in the Construction Chemicals Sector (Oct. 17, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5061; Construction News, Competition Regulators Probe Concrete Additive Firms (Oct. 19, 2023), https://www.constructionnews.co.uk/legal/competition- regulators-probe-concrete-additive-firms-19-10-2023/.

[8] GCR, Sika, Saint-Gobain and Cinven-owned Business Targeted in Cross-Border Cartel Probe (Oct. 18, 2023), https://globalcompetitionreview.com/article/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe.

[9] Construction News, Competition Regulators Probe Concrete Additive Firms (Oct. 19, 2023), https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/.

[10] ICIS, EU, UK, Turkey Authorities Launch Construction Chems Antitrust Investigation (Oct. 18, 2023), https://www.icis.com/explore/resources/news/2023/10/18/10935016/eu-uk-turkey-authorities-launch-construction-chems- antitrust-investigation/.

[11] Saint-Gobain Remains Committed to Deal to Take Over Sika, https://www.reuters.com/article/us-sika-cie-saint-gobain-idUSKBN1300II (last updated Nov. 6, 2016).

Gobain S.A. abandoned its takeover attempt, and agreed to reduce its stake to more than ten percent that it would hold for at least two years.[12] Before selling its Sika AG stock in 2020, Compagnie de Saint-Gobain S.A. was the largest shareholder in Sika AG.[13]

8.      The alleged conspiracy was born from this attempted merger. At the time it was launched, the market was already highly susceptible to collusion: the supply side was concentrated with high barriers to entry; the demand side was unconcentrated; and the demand for CCAs was inelastic. Sika AG and Compagnie de Saint-Gobain S.A., with their shared financial interest through Compagnie de Saint-Gobain S.A.'s significant financial stake in Sika AG, leveraged these susceptibilities and agreed to cease competing with one another in order to better ensure they both obtained higher prices for CCAs. This anticompetitive agreement, however, faced a problem: there were a handful of other, competing manufacturers of CCAs. Because these competitors were a threat to Compagnie de Saint-Gobain S.A. and Sika AG's agreement to charge higher prices for CCAs, the co-conspirators agreed to a joint, worldwide buying spree, ultimately purchasing no fewer than a half-dozen of their shared competitors between 2017 and the present. This agreement was aided and abetted at all times by Cinven, with Euclid Group thereafter joining the conspiracy. As Sika told investors in its 2022 Annual Report, it had "consolidate[d] fragmented [market segments]" to strengthen its core business.[14]

---

[12] Market Watch, Saint-Gobain, Sika and Burkard Family End Dispute (May 11, 2018), https://www.marketwatch.com/story/saint-gobain-sika-and-burkard-family-end-dispute-2018-05-11; Saint-Gobain's U.S. Deal will Cement its Sika Envy, https://www.reuters.com/breakingviews/saint-gobains-us-deal-will-cement-its-sika-envy-2021-12-06/ (last updated Dec. 6, 2021).

[13] VY Tyndall Global Select Fund Commentary, 5 (Oct. 2019), https://www.tyndallim.co.uk/wp-content/uploads/2019/11/1910-VT-Tyndall-Global-Select-Fund-Commentary.pdf; Saint-Gobain Sells Sika Stake, Formally Ending Bitter Takeover Battle, https://www.reuters.com/article/us-sika-m-a-saintgobain/saint-gobain-sells-sika-stake-formally- ending-bitter-takeover-battle-idUSKBN2331J1 (last updated May 27, 2020).

[14] Sika,  Annual  Report 2022, 13, https://www.sika.com/dms/getdocument.get/55534c2a-608c-4ec2-bc9f-df21d5ada6bd/glo-ar-2022-sika-business-year.pdf.

9.     Defendants' agreement became increasingly effective as they consolidated their market power, and prices for CCAs continued to rise. The onset of Covid in 2021, however, supercharged Defendants' conspiracy. With no meaningful check on their pricing power, Defendants agreed to institute (a) price increases on the CCAs, and (b) surcharges on top of those price increases, including shipping surcharges and raw material surcharges.

10.     Defendants have been secure in their knowledge that their competitors—the other Defendants—will not undercut them on price. For example, one industry analyst, in discussing at least the third price increase made by Sika in 2021,[15] stated, "They are not losing sales when increasing prices because competitors will also not sell at lower prices."[16] Similarly, Frank Sullivan, the Chairman, President, and CEO of RPM, admitted on an earnings call in July of 2023 that Euclid Group was charging too much for its CCAs but that the company (trusting that it would not be undercut on price) "held our pricing and held our discipline" and, as a result, reaped substantial supracompetitive profits on its CCAs.[17]

11.     Moreover, Defendants' claimed justification for these price hikes and surcharges is pretextual. The spike in raw material and shipping costs was either non-existent or short lived. In comparison, Defendants' price increases, including surcharges, on CCAs have been both extreme and persistent.

12.     Defendants' conspiracy was facilitated through their shared membership in numerous trade associations. Specifically, Defendants (or their affiliates) are members of

---

[15] Sika Raises Prices to Counter Jump in Raw Material Costs, https://www.reuters.com/article/sika-results-materials/sika-raises-prices-to-counter-jump-in-raw-material-costs-idUSZ8N1UN01 (last updated Feb. 22, 2019) (noting price increases in January 2021 and March 2021).

[16] Update 2-Chemicals Group Sika Tackles Higher Costs by Raising Prices, https://www.reuters.com/article/sika-results/update-2-chemicals-group-sika-tackles-higher-costs-by-raising-prices-idUSL4N2RI0XW (last updated Oct. 21, 2021).

[17] Q4 2023 RPM International Inc. Earnings Call Transcript (July 26, 2023), https://www.rpminc.com/media/4837/rpm-q4-23-transcript.pdf.

numerous national CCA trade associations, providing ample opportunity to meet and conspire. These shared CCA trade associations include the Belgian CCA trade association, Federatie van Invoerders en Producenten van Hulpstoffen voor betons en mortels ("FIPAH");[18] the French CCA trade association, Syndicat National des Adjuvants pour Bétons et Mortiers ("SYNAD");[19] the Italian CCA trade association, Associazione Italiana Produttori Additivi e Prodotti per Cemento e Calcestruzzo ("ASSIAD");[20] the Norwegian Committee for Concrete Admixtures ("NCCA");[21] the Spanish CCA trade association, Asociación Nacional de Fabricantes de Aditivos para Hormigón y Mortero ("ANFAH");[22] the Swedish Association for Concrete Admixtures ("SACA");[23] the Turkish CCA trade association, Beton ve Harç Kimyasal Katkı Maddeleri Üreticileri Derneği ("KUB");[24] and the UK CCA trade association, Cement Admixtures Association ("CCA").[25] Notably, each of these CCA trade associations is also a member of an umbrella trade association: European Federation of Concrete Admixtures Association ("EFCA"). The EFCA describes itself as "a partnership of 13 National Admixture Associations, formed in 1984 in order to represent the interests of the industry. . . . EFCA's total membership provides in excess of 80% of admixture sales within Europe and represents all the major admixture manufacturers."[26]

---

[18] FIPAH, Members, https://www.fipah.be/fr/membres/.

[19] Synad, https://www.synad.fr/synad-syndicat-des-fabricants-d-adjuvants-beton-colorants-fibres.

[20] ASSIAD, The Structure, https://www.assiad.it/LAssociazione/La-struttura?cf_chl_rt_tk=u7pLurzdoe4b4m7JWGOfds7HNRCC9lGE05zRTEktZi4-1700142619-0-gaNycGzNChA.

[21] NCAA, https://ncca.no/.

[22] ANFAH, Associate Members, https://anfah.org/anfah/miembros-de-anfah/.

[23] SACA, Member Companies, https://www.saca.se/medlemmar.html.

[24] KUB, About Us, https://kub.org.tr/hakkimizda/.

[25] Cement Admixtures Association, Members, https://www.admixtures.org.uk/members. Cement Admixtures Association, Members, https://www.admixtures.org.uk/members.

[26] EFCA, About Us, https://www.efca.info/about-us/.

13.     And in the United States, Defendants are "super sponsors" of the National Ready-Mix Concrete Association ("NMRCA"), a trade association founded in 1930, long before most of the construction chemicals at issue came into existence. While many of NMRCA's members are buyers who bought CCAs directly from Defendants and thus were harmed by Defendants' anticompetitive conduct, the NMRCA, even if not a co-conspirator, provided Defendants with yet a further opportunity to meet and collude among themselves under the guise of participation in a legitimate trade association. The NMRCA also provided Defendants with benchmarking analyses that Defendants could misuse to further their efforts to fix CCA prices.

14.     In sum, beginning no later than May 11, 2018, Defendants entered into an agreement to consolidate their control over the global manufacture of CCA and thereafter, fix the prices for CCA. This agreement, which was effectuated through Defendants' common ownership, hiring of leaders previously employed by competitors, and membership in numerous shared trade associations, resulted in Plaintiff and members of the Class paying supra-competitive prices for CCAs in the United States. Through this action, Plaintiff, on behalf of itself and members of the Class, seek to recover the overcharges they paid to Defendants.

## II.     JURISDICTION AND VENUE

15.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiff also brings these state law class claims on behalf of all the classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by defendants' conduct in restricting the supply of increasing the price of CCAs. Plaintiff seeks damages in excess of $5,000,000, and there are members of each Class which are citizens of a different state than the defendants. This

Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

16.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

17.     This Court also has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of CCAs throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

18.     The activities of Defendants, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

## III.     PARTIES AND UNNAMED CO-CONSPIRATORS

### A.     Plaintiff

19.     Plaintiff Lakewood Concrete Corp. is a business incorporated in the State of New York with its primary place of business at 185 East Livingston Avenue, Jamestown, New York, 14701. During the Class Period, Plaintiff purchased CCAs at supra-competitive prices other than

directly from one or more of the Defendants, and suffered antitrust injury and damages as a material, direct, and proximate results of Defendants' conspiracy and overt acts in furtherance thereof.

**B.    Defendants**

**1.    Sika**

20.     Defendant Sika AG is a Swiss corporation with its primary place of business at Zugerstrasse 50 Baar, Zug, 6341 Switzerland. During the Class Period, Sika AG manufactured and sold CCAs around the World, including in the United States, both directly and through its wholly-owned subsidiary, Defendant Sika Corporation, and/or through its predecessors, affiliates, or subsidiaries.

21.     Defendant Sika Corporation is a New Jersey corporation with its primary place of business at 201 Polito Ave Lyndhurst, New Jersey, 07071. Sika Corporation has approximately thirty-six (36) locations throughout North America, including twenty-eight (28) in the United States and three (3) in this District.[27] During the Class Period, Sika Corporation manufactured and sold CCAs in the United States, directly and/or through its predecessors, affiliates, or subsidiaries.

22.     Sika Corporation is a wholly owned subsidiary of Sika AG. Sika AG controls Sika Corporation both generally and with respect to the conduct of Sika Corporation in furtherance of the unlawful acts alleged in this Complaint.

23.     Sika AG and Sika Corporation are collectively referred to herein as "Sika."

**2.    Saint-Gobain**

---

[27] SIKA, Locations, https://usa.sika.com/en/about-us/sika-usa-locations.html.

24.     Defendant Compagnie de Saint-Gobain S.A. is a French corporation with its primary place of business at Tour Saint Gobain,12 Place De L Iris Courbevoie, Ile-De-France, 92400 France. During the Class Period, Saint-Gobain Group manufactured and sold CCAs around the World, including in the United States, both directly and through its wholly owned subsidiaries, Saint-Gobain North America, Chryso, Inc., and GCP.

25.     Defendant Saint-Gobain North America is a Pennsylvania corporation with its primary place of business at 20 Moores Rd., Malvern, Pennsylvania, 19355. Saint-Gobain North America has approximately 150 locations throughout North America, including 106 in the United States and five in this District.[28] During the Class Period, Saint-Gobain North America manufactured and sold CCAs in the United States, directly and/or through its predecessors, affiliates, or subsidiaries.

26.     Defendant Chryso, Inc. is a Michigan corporation with its primary place of business at 1611 Highway 276, Rockwall, TX 75032. With over 1,300 staff worldwide, Chryso has twenty-two (22) foreign subsidiaries and serves customers in more than one hundred (100) countries,[29] including four (4) in the United States.[30] During the Class Period, Chryso, Inc. manufactured and sold CCAs in the United States, directly and/or through its predecessors, affiliates, or subsidiaries.

27.     Defendant GCP is a Georgia corporation with its primary place of business at 2325 Lakeview Parkway, Suite 450 Alpharetta, GA 30009. GCP employs roughly 2,400 people in more than 40 countries, serving customers in more than 110 countries, including in the United States.[31]

---

[28] Saint-Gobain, Manufacturing Sites, https://www.saint-gobain-northamerica.com/manufacturing-sites.

[29] Cement Admixtures Association, Members, https://www.admixtures.org.uk/members/.

[30] CHRYSO, Inc. LinkedIn Profile, https://www.linkedin.com/company/chryso-inc/about/.

[31] GCP Applied Technologies, Locations, https://ca.gcpat.com/en/about/locations.

During the Class Period, GCP manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

28.     Saint-Gobain North America, Chryso, Inc., and GCP are wholly owned subsidiaries of Compagnie de Saint-Gobain S.A. Compagnie de Saint-Gobain S.A. controls Saint Gobain North America, Chryso, Inc., and GCP. both generally and with respect to the conduct of Saint Gobain North America, Chryso, Inc., and GCP Applied Technologies, Inc. in furtherance of the unlawful acts alleged in this Complaint.

29.     Compagnie de Saint-Gobain S.A., Saint-Gobain North America, Chryso, Inc., and GCP Applied Technologies, Inc. are collectively referred to herein as "Saint-Gobain Group."

### 3.     Master Builders Group

30.     Defendant Cinven Ltd. is a British corporation with its primary place of business at 21 St. James's Square, London, SW1Y 4JZ, United Kingdom. Cinven Ltd. manufactures and sells CCAs around the World, including in the United States, through its predecessors, affiliates, or subsidiaries, including Cinven, Inc., MBSD, and MBSA.

31.     Defendant Cinven, Inc. is a New York corporation with its primary place of business at Tower 49, 12 East 49th Street, New York, NY 10017.[32] Cinven Inc. manufactures and sells CCAs around the World, including in the United States and its territories, through its predecessors, affiliates, or subsidiaries, including MBSA. Defendants Cinven Ltd. and Cinven Inc. are collectively referred to herein as "Cinven."

32.     Defendant MBSD is a German corporation with its primary place of business at Glücksteinallee 43-45, 68163 Mannheim, Germany. During the Class Period, MBSD manufactured and sold CCAs around the World, including in the United States and its territories,

---

[32] Cinven, Locations, https://www.cinven.com/site-tools/cinven-offices.

both directly and through its predecessors, affiliates, or subsidiaries, including MBSA. Indeed, the CEO of MBSA, Borris Gorella, is the Managing Director of MBSD's parent company, Master Builders Solutions Holdings GmbH.

33.     Defendant MBSA is a Delaware corporation with its primary place of business at 23700 Chagrin Blvd., Beachwood, Ohio, 44122. MBSA has approximately three (3) locations throughout North America, including two (2) in the United States.[33] During the Class Period, MBSA manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

34.     MBSD and MBSA are wholly owned subsidiaries of Cinven. Cinven controls MBSD and MBSA both generally and with respect to the conduct of MBSD and MBSA in furtherance of the unlawful acts alleged in this Complaint.

35.     MBSD, MBSA, and Cinven are collectively referred to herein as "Master Builders Group."

### 4.    Euclid Group

36.     Defendant Euclid is an Ohio corporation with its primary place of business at 19215 Redwood Rd, Cleveland, Ohio 44110. Euclid has approximately twenty-eight (28) locations in North America, including twenty-one (21) locations in the United States, one of which is in this District.[34] During the Class Period, Euclid manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

37.     Defendant RPM is a Delaware corporation with its primary place of business at 2628 Pearl Road, Medina, Ohio 44256. During the Class Period, RPM manufactured and sold

---

[33] Master Builders Solutions, Our Locations, https://www.master-builders-solutions.com/about-us/our-locations.

[34] The Euclid Group, Locations, http://12.43.214.238/locations.

CCAs around the World, including in the United States and its territories, both directly and through its predecessors, affiliates, or subsidiaries, including Euclid.

38.    Euclid is a wholly owned subsidiary of RPM. RPM controls Euclid both generally and with respect to the conduct of Euclid in furtherance of the unlawful acts alleged in this Complaint.

39.    Euclid and RPM are collectively referred to herein as "Euclid Group."

### 5.    Doe Defendants

40.    Doe Defendants 1-10 are members of the price-fixing conspiracy alleged herein whose identities are presently unknown to Plaintiff. These include, among other entities, the various "industry bodies" referenced in the CMA's statement regarding the raids. Plaintiff expects that the identity of these Doe Defendants will be revealed during discovery, at which point Plaintiff will seek leave to amend its complaint to add those entities in place of the Doe Defendants.

### C.    Agents and Unnamed Co-Conspirators

41.    The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

42.    Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

43.    Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

13

## IV.    FACTUAL ALLEGATIONS

### A.    CCAs, Generally

#### 1.    CCAs Are an Essential Input in Cement, Concrete, and Mortar

44.    CCAs are added to cement, concrete, and mortar to improve their safety and functionality.

45.    Concrete is an important resource for all kinds of construction projects in the United States. Just over half of the low-rise (less than three-stories in height) structures in the United States are built out of concrete.[35]

46.    Cement is a binding agent made from limestone and clay and is also used extensively in building here in the United States. Cement production in the United States reached its highest level in more than a decade in 2022, amounting to 95 million metric tons.[36]

47.    Mortar is a combination of cement and sand and is primarily used to hold ready-made building units (like bricks or blocks) in place.

48.    **Figure 1**, below, illustrates the differences and uses of concrete, cement, and mortar:[37]

---

[35] PCA, Buildings & Structures, https://www.cement.org/cement-concrete/paving/buildings-structures. PCA, Buildings & Structures, https://www.cement.org/cement-concrete/paving/buildings-structures.

[36] Statista, Apparent Cement Consumption in the U.S. from 2010 to 2022 (Oct. 30, 2023), https://www.statista.com/statistics/273367/consumption-of-cement-in-the-us/.

[37] The Spruce, Differences Between Cement, Concrete, and Mortar, https://www.thespruce.com/thmb/r3NjpAf8yDRYLArSXx2BX2iwcOM=/1500x0/filters:no_upscale():max_bytes(150000):strip_icc()/difference-between-cement-concrete-and-mortar-2130884-final-ac-5c1aa0e546e0fb0001909553-fd07f31197cd491e85bf0eb8200f6f5e.png.

| Figure 1: Cement vs. Concrete vs. Mortar |
|:---:|



49.     CCAs are integral to the construction of America's infrastructure, including residential, commercial, and industrial buildings, roads, bridges, tunnels, and airports.[38] Indeed, the CMA recently concluded that CCAs are "an essential input in the production" of cement, concrete, and mortar.[39]

---

[38] International Association of Certified Home Inspectors, Concrete Admixtures, https://www.nachi.org/concrete-admixtures.html.

[39] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 4 (Sept. 23, 2022).

50.     The essential nature of CCAs is shown in **Figure 2**, below, from Saint-Gobain:[40]



*Figure 2: How CCAs Are Used*

51.     Due to their essential nature, the vast majority of projects using concrete, cement, and/or mortar also use CCAs.

### 2.     Types of CCAs

52.     As noted above, CCAs include three types of products: (a) chemical admixtures for cement, (b) chemical admixtures for concrete, and (c) admixtures for mortar. The CMA has described the uses for each as follows:

---

[40] Joana Alberto, LinkedIn Post (2022), https://www.linkedin.com/posts/joana-alberto_constructionchemestry-solutions-decarbonazation-activity-6940612387087503360-sqzk/?utm_source=share&utm_medium=member_desktop.

Chemical admixtures for cement are added to cement in order to reduce the amount of energy required to grind the cement (ie grinding aids) as well as to improve the performance of the cement (ie performance enhancers or quality improvers);

Chemical admixtures for concrete are added to improve the properties of concrete or wet mortar, including super-plasticizers, plasticizers, air entrainers, retarders and accelerators; and

Other chemical admixtures include admixtures for dry mortar and certain admixtures for wet mortar that are not also used for concrete, for example as they increase the adhesion properties of mortar but do not reduce the amount of water required.[41]

53.     Manufacturers of CCAs use the same equipment and chemicals to produce these CCAs, so they can quickly and cost-effectively shift production from one category of CCA to another.[42] On the other hand, purchasers of CCAs do not view these products as interchangeable, nor do purchasers view there as being substitutes for CCAs.

54.     The American Society for Testing and Materials ("ASTM") identifies seven primary types of CCAs, based on the qualities they add to the aggregate material: (a) Type A—water reducing (plasticizer); (b) Type B—retarding; (c) Type C—accelerating; (d) Type D—water reducing and retarding; (e) Type E—water reducing and accelerating; (f) Type F—water reducing, high range ("HRWR," or superplasticizer); and (g) Type G—water reducing, high range, and retarding.[43] The ASTM also recognizes several other admixture types, including those that have air entraining (to enhance compressive or flexural strength of concrete), and cold weather setting properties.

---

[41] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, FN 57 (Sept. 23, 2022).

[42] Id.

[43] ASTM, Standard Specification for Chemical Admixtures for Concrete, https://www.astm.org/c0494_c0494m-17.html (last updated Mar. 10, 2020).

55.     The various types of CCAs are shown in **Figure 3**, below.[44]

| **Figure 3: Types of CCAs, By ASTM Code** | | |
|---|---|---|
| **ASTM Code** | **Use** | **Active Ingredient(s)[45]** |
| C494 Type A | Water Reducing (*i.e.*, reduce the water required to achieve a given consistency) | Lignosulfonates; Hydroxylated carboxylic acids; Melamine sulfonate; Phosphonate salts; Naphthalene sulfonate |
| C494 Type B | Retarding (*i.e.*, delay setting) | Amino Trimethylene Phosphonic Acid ("ATMP") |
| C494 Type C | Accelerating (*i.e.*, speed up the setting and early strength development) | Calcium chloride; Triethanolamine; Aluminum hydroxide; Aluminum sulfate; Calcium nitrite; Oxalic acid; Sodium thiocyanate; Sodium thiosulfate; Calcium formate; Silica fume; Silica gel |
| C494 Type D | Water Reducing & Retarding | *See* Type A & Type B |
| C494 Type E | Water Reducing & Accelerating | *See* Type A & Type C |
| C494 Type F | Water Reducing & High Range ("Superplasticizer" "HRWR") | Polyether alcohols |
| C494 Type G | Water Reducing, High Range, & Retarding | *See* Type B & Type F |

---

[44] *Id.*; ASTM, Standard Specification for Air-Entraining Admixtures for Concrete, https://www.astm.org/c0260_c0260m-10ar16.html (last updated Dec. 27, 2016); ASTM, Standard Specification for Admixtures to Inhibit Chloride-Induced Corrosion of Reinforcing Steel in Concrete, https://www.astm.org/c1582_c1582m-11r17e01.html (last updated July 28, 2017); ASTM, Standard Specification for Cold-Weather Admixture Systems, https://www.astm.org/c1622_c1622m-10r16e01.html (last updated Dec. 27, 2016); ASTM, Standard Specification for Pigments for Integrally Colored Concrete, https://www.astm.org/c0979_c0979m-16.html (last updated Dec. 27, 2016); Concrete Network, Admixtures by Classification, https://www.concretenetwork.com/photo- gallery/site_26/chris-sullivan_14351/.

[45] Bisley International, Raw Materials for Concrete Admixture, https://bisleyinternational.com/raw-materials-for-concrete-admixture.

| C260 | Air Entraining (*i.e.*, improved durability, compressive and flexural strength) | Salts of wood resins; Some synthetic detergents; Salts of sulfonated lignin; Salts of petroleum acids; Salts of proteinaceous material; Fatty and resinous acids and their salts; Alkydbenzene sulfonates; Fatty alcohols and other surfactants |
| C618 | Reduce costs; improve workability and plasticity | Natural Pozzolans; Fly ash |

| C494 Type S | Water Repelling (*i.e.*, decrease permeability of finished concrete surface) | Stearate of calcium, aluminum, ammonium, or butyl; Petroleum greases or oils; Soluble chlorides |
| C1582 | Corrosion Inhibiting | Calcium nitrite Lithium nitrate |
| 1622 | Cold Weather Setting | Sodium nitrite |

56.     As **Figure 3** shows, CCAs are made by blending polymers and other chemicals together. These raw materials can be difficult to manufacture, as they require specialized facilities and significant research and development. Whereas Defendants research, develop, and manufacture at least some of these polymers in-house (though they also purchase polymers from third parties),[46] smaller manufacturers of CCAs source these polymers exclusively from third parties.

57.     In recent years, there has been a reported shortage in the polymers necessary to manufacture CCAs, thus giving Defendants (who produce at least some of their own polymers in- house) a competitive advantage over smaller manufacturers of CCAs.[47] However, as set forth

---

[46] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 42 (Sept. 23, 2022).

[47] *Id.*

in greater detail herein, the alleged shortage in these polymers does not and cannot fully explain Defendants' huge price increases and surcharges for CCAs that they implemented during the Class Period.

### 3.      How CCAs Are Sold and Who Buys Them

58.      Most CCAs are sold in ready-to-use liquid form and can be added to the aggregate either at the plant where the aggregate product is produced (e.g., ready-made concrete mix) or at the jobsite where it is to be used.[48]

59.      An example of how CCAs are packaged and sold is shown in **Figure 4**, below:[49]

*Figure 4: Picture of SikaMix AE-6 Packaging*



## SikaMix AE-6

### Water Repelling and Efflorescence Reducing Admixture

SikaMix AE-6 is a high performance water repelling and efflorescence reducing admixture for various concrete applications. SikaMix AE-6 is formulated to meet ASTM E514 "Standard Test Method for Water Penetration and Leakage Through Masonry."

SikaMix AE-6 is suitable for the production of drycast and wet cast concrete.   Use of SikaMix AE-6 results in:

✓ Improved water repellency.

✓ Reduced efflorescence.

✓ Improved color vibrancy and pigment efficiency.

⬇ PRODUCT DATA SHEET    ⬇ SAFETY DATA SHEET    SHOW ALL DOCUMENTS

---

[48] Sika, Corporate Governance (2022), https://www.sika.com/dam/dms/corporate/media/glo-ar-2022-corporate-governance.pdf.

[49] Sika USA, SikaMix AE-6, https://usa.sika.com/en/construction-products/concrete/concrete-admixtures/dry-cast-admixtures/efflorescence-control/sikamix-ae-6.html; see also Master Builders Solutions, Concrete Admixtures, https://www.master-builders-solutions.com/en-us/products/concrete-admixtures; CHRYSOQuad, Lower Quality Sands: Impact Concrete Performance and Placement, https://www.chrysoinc.com/solutions/chrysoquad/; Sika USA, A Complete Range of Concrete Admixtures, https://usa.sika.com/en/construction/concrete/concrete-admixtures.html.

60.     Purchasers of CCAs operate in the construction and industrial sectors and include producers of ready-mixed concrete, shotcrete,[50] and pre-cast concrete.[51] Purchasers of CCAs typically purchase the majority of their CCAs from a single supplier.[52]

61.     In general, CCAs are sold by Defendants directly to suppliers of ready-mix concrete and masonry, as well as through distributors.

**B.     The Market for CCAs in the United States and Its Territories**

62.     The United States is a large market for CCAs, at roughly $3 billion per year.[53] Roughly $100 million is imported into the United States each year.[54]

63.     Defendants are the dominant manufacturers and sellers of CCAs in the World, and in the United States and its territories. On information and belief, Plaintiff's estimate of Defendants' market share in the United States is between eighty and ninety percent (80% to 90%).[55]

64.     Defendants manufacture and sell numerous CCAs in the United States and its territories, as well as around the World. Purchasers of CCAs in the United States and its territories import them directly from the foreign Defendants (e.g., Compagnie de Saint-Gobain S.A., Sika AG, and MBSD) and buy them from their domestic subsidiaries (e.g., Sika Corp., Chryso, GCP,

---

[50] Shotcrete (or gunite) is a type of ready-mixed concrete that, instead of being poured and spread, is fed through a hose and applied using a high-pressure sprayer. It is typically used for concrete walls, such as in tunnels.

[51] Sika USA, A Complete Range of Concrete Admixtures, https://usa.sika.com/en/construction/concrete/concrete-admixtures.html.

[52] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 49 (Sept. 23, 2022).

[53] Mordor Intelligence, North America Concrete Admixtures Market Size & Share Analysis – Growth Trends & Forecasts 2023 – 2028, https://www.mordorintelligence.com/industry-reports/north-america-concrete-admixtures-market.

[54] U.S. International Trade Commission, U.S. Imports for Consumption HTS6 3824.40, https://hts.usitc.gov/search?query=6%20382440.

[55] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 75 (Sept. 23, 2022).

and MBSA).[56] The below figures list some of the CCAs sold in the United States and its territories by Defendants.

65.    **Figure 5** lists some of the CCAs sold by Sika in the United States and its territories:

| Figure 5: CCAs Sold by Sika | | | |
| --- | --- | --- | --- |
| Chromix | SikaMultiAir | SikaViscoFlow | SikaMix |
| SikaAEA | SikaPlastiment | Sika Watertight Concrete Powder | SikaPlast |
| SikaAir | SikaPlastocrete | SikaWT | SikaQuick Winter Boost |
| SikaAntisol | SikaRapid | SikaColor | SikaSet |
| SikaCem | SikaRugasol | SikaControl | SikaTard |
| SikaCem Summer Extender | SikaSigunit | Sikacrete | SolarChrome |
| SikaCNI | SikaStabilizer | Sikament | ViscoCrete |
| SikaGrind | Sika FerroGard | Sika Lightcrete Powder | Sika Lightcrete Liquid |

66.    **Figure 6** shows some of the CCAs sold by Saint-Gobain Group in the United States and its territories:

| Figure 6: CCAs Sold by Saint-Gobain Group | | | |
| --- | --- | --- | --- |
| Chryso | | | |
| CHRYSO Air | CHRYSO Aqua | CHRYSO CI | CHRYSO Control |
| CHRYSO DSF | CHRYSO Dust Suppressant | CHRYSO EnviroMix | CHRYSO Fluid ProPel |
| CHRYSO Fluid Optima | CHRYSO Fluid Premia | CHRYSO NutralSet | CHRYSO Optima |
| CHRYSO Optifinish | CHRYSO PoreTite | CHRYSO Plast | CHRYSO Premia |
| CHRYSO Quad | CHRYSO Quad EMx | CHRYSO Serenis | CHRYSO Tard |
| CHRYSO TurboCast | -- | -- | -- |

---

[56] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 124(b) (Sept. 23, 2022).

| GCP | | | |
|---|---|---|---|
| Adva | Daratard | Force | RDA |
| Airalon | Daravair | Hydrophobe | Recover |
| Clarena | Darex | Mira | Synchro |
| Daraccel | DCI | Optec | Tavero |
| Daracem | Dry-Block Admixture | Polarset | Terapave |
| DaraFill | Dry-Block Mortar Admixture | Postrite | Tyronix |
| Darapel | Eclipse | Quantec | Tytron |
| Daraset | FXP | Rasir | V-Mar |
| WRDA | Zyla | -- | -- |

67.     **Figure 7** shows some of the CCAs sold by Master Builders Group in the United

States and its territories:

| MasterAir | MasterGlenium | MasterPolyheed | MasterSet |
|---|---|---|---|
| MasterCast | MasterLife | MasterPozzolith | MasterSure |
| MasterCell | MasterMatrix | MasterRheobuild | Master X-Seed |
| MasterColor | MasterPel | --- | --- |

68.     **Figure 8** shows some of the CCAs sold by Euclid Group in the United States and

its territories:

| Accelguard | Eucon Barracade | Eucon MRX | Eucon Retarder |
|---|---|---|---|
| Conex | Eucon BCN | Eucon NR | Eucon WRX |
| Eucon 37 | Eucon CIA | Eucon NW | Eucon X |
| Eucon 1037 | Eucon DS | Eucon SE | Eucon SRA |
| Eucon 537 | Eucon Easy Fill | Eucon SP | Eucon Stasis |
| Eucon A+ | Eucon Integral ARC | Eucon Sureshot | Eucon WR |
| Eucon ABS | Eucon LR | Eucon Vandex | Plastol |
| Eucon Air | Eucon LW | Eucon WO | Visctrol |
| Eucon AWA | Eucon MR | -- | -- |

**C.**     **Global Antitrust Investigations into Defendants' Anticompetitive Conduct**

69.     On October 17, 2023, the EC announced that it had carried out dawn raids at several

firms active in the construction chemicals industry in connection with suspected cartel conduct:

> On 17 October 2023, the European Commission carried out
> unannounced inspections at the premises of companies active in the
> concrete chemical admixture industry in various Member States.
>
> The inspections concern possible collusion in relation to the supply
> of chemical product ingredients that are added to cement, concrete
> and mortar to modify and improve their properties and provide them
> with specific qualities.
>
> The Commission has concerns that companies in the concrete
> chemical admixture industry worldwide ***may have violated EU
> antitrust rules that prohibit cartels and restrictive business
> practices*** (Article 101 of the Treaty on the Functioning of the
> European Union).
>
> The EC said its inspections "were conducted in coordination with
> the UK CMA and the Turkish Competition Authority", adding that
> it had also been in contact with the US Department of Justice's
> Antitrust Division.[57]

70.     The EC was accompanied by its counterparts from the national competition

authorities of the European Union Member States where the inspections were carried out.[58]

71.     That same day, the CMA confirmed its participation in the investigation and named

Sika, Saint-Gobain Group, and Master Builders Group as the subject of that investigation:

> The CMA has reason to suspect anti-competitive behaviour has
> taken place involving suppliers of chemical admixture and products
> containing CCA for use in the manufacture of consumer products
> such as household and personal care products.

---

[57] Construction News, Competition Regulators Probe Concrete Additive Firms (Oct. 19, 2023),
https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/
(emphasis added).

[58] GCR, Sika, Saint-Gobain and Cinven-owned Business Targeted in Cross-Border Cartel Probe (Oct. 18, 2023),
https://globalcompetitionreview.com/article/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe (emphases added).

The businesses under investigation by the CMA are: Sika AG, Sika Corporation, Saint-Gobain Group, Saint-Gobain North America, Master Builders Construction Chemicals Group, Master Builders Solutions Admixtures US, LLC, Cinven Group LTD, and Cinven Group LTD.

The CMA has been in contact with the Antitrust Division of the US Department of Justice, the European Commission and the Turkish Competition Authority in relation to this matter, and this investigation has been launched in consultation with them.[59]

72.     The EC, CMA, and TCA confirmed their involvement in the investigation and

provided further details regarding the conduct they were investigating:

The European Commission opened an investigation into antitrust violations at construction chemical operations. There are suspicions that producers have colluded.

The CMA has indications that there is anticompetitive conduct between a "number of suppliers" and "some industry bodies" in violation of cartel law. The searches come five months after chemical admixture supplier Sika completed its proposed £4.5 billion acquisition of rival [Master Builders] Group. ***There are suspicions that these undertakings have coordinated their pricing policy, prohibited their competitors from supplying certain customers and limited the production of essential ingredients used in the production of concrete, mortar and cement.*** The undertakings involved in the investigation are Sika AG, Sika Corporation (USA), Saint-Gobain North America (USA), Master Builders Construction Chemicals Group, Master Builders Solutions Admixtures US, LLC (USA), Cinven LTD, and Cinven Group LTD.

Dawn raids were conducted at various locations. These were carried out in consultation with other competition authorities, namely the European Commission, the US Department of Justice Antitrust Division, the Turkish Competition Authority, and the UK Competition and Markets Authority.[60]

---

[59] Gov.UK, Suspected Anti-Competitive Conduct in Relation to the Supply of Chemicals for Use in the Construction Industry (Oct. 17, 2023), https://www.gov.uk/cma-cases/suspected-anti-competitive-conduct-in-relation-to-the-supply-of-chemicals-for-use-in-the-construction-industry (emphasis added).

[60] ICIS, EU, UK, Turkey Authorities Launch Construction Chems Antitrust Investigation (Oct. 18, 2023), https://www.icis.com/explore/resources/news/2023/10/18/10935016/eu-uk-turkey-authorities-launch-construction-chems-antitrust-investigation/ (emphases added).

73.     Sika, Saint-Gobain Group, and Master Builders Group have all confirmed that they are subjects of the investigation, as set forth below.[61]

74.     On October 18, 2023, Sika confirmed the investigation in a statement to Construction News ("CN"): Sika confirmed to CN that inspections had taken place into "suspected antitrust irregularities in the area of additives for concrete and cement," adding that "[t]he fair operations of the markets is fundamental to Sika and we support this investigation with all our efforts and cooperate fully with the authorities."[62]

75.     On October 18, 2023, Saint-Gobain Group confirmed its cooperation in an email: "We can confirm that Saint-Gobain is aware of competition law investigations and cooperating with these investigations."[63]

76.     That same day, Master Builders Group confirmed the investigation by the EC.[64]

77.     The inspections by the EC were not undertaken casually. Inspections are typically done by an order of the EC, and the EC must have "reasonable grounds for suspecting an infringement of the competition rules;" "[i]t must be borne in mind that the inspections carried out by the Commission are intended to enable it to gather the necessary documentary evidence to

---

[61] GCR, Sika, Saint-Gobain and Cinven-owned Business Targeted in Cross-Border Cartel Probe (Oct. 18, 2023), https://globalcompetitionreview.com/article/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe.

[62] Construction News, Competition Regulators Probe Concrete Additive Firms   (Oct. 19, 2023), https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/.

[63] Nasdaq, St Gobain says Cooperating in EU Probe into Construction Chemicals Cartel, https://www.nasdaq.com/articles/st-gobain-says-cooperating-in-eu-probe-into-construction-chemicals-cartel (last updated Oct. 18, 2023).

[64] GCR, Sika, Saint-Gobain and Cinven-owned Business Targeted in Cross-Border Cartel Probe (Oct. 18, 2023), https://globalcompetitionreview.com/article/update-sika-saint-gobain-and-cinven-owned-business-targeted-in-cross-border-cartel-probe.

check the actual existence and scope of a given factual and legal situation concerning which it already possesses certain information."[65]

78.     The same is true for the TCA. Earlier this year, the Turkish Constitutional Court, the highest legal body for constitutional review in Turkey, held that the TCA may conduct a dawn raid after first obtaining a search warrant from a Turkish criminal court.[66]

79.     This investigation follows several years in which the Defendants have generally increased their profits while also imposing price increases and surcharges that are not adequately explained by other competitive factors.

80.     These increases in profits during the Class Period are inconsistent with the Defendants' pretextual explanation that their price increases were intended to offset rising costs and are more consistent with the existence of a conspiracy to fix prices.

### D.     Defendants Effectuated Their Conspiracy Through Their Shared CCA Trade Associations

81.     In announcing the coordinated dawn raids, the CMA stated that the anticompetitive conduct at issue included not only individual companies, but also "some industry bodies." This is hardly surprising, given that Defendants share membership in a multitude of CCA trade associations around the World. This gave Defendants ample opportunity to meet and conspire in furtherance of their agreement to fix prices for CCAs.

82.     Defendants Sika, Saint-Gobain Group, and Master Builders Group are members of the following shared trade associations: (a) the Belgian CCA trade association, FIPAH;[67] (b) the

---

[65] Case No. T-135/09, Nexans France SAS v. Comm'n, 2012 E.C.R. 43, https://curia.europa.eu/juris/document/document.jsf?text=&docid=129701&pageIndex=0&doclang=EN&mode=lst &dir=&occ=first&part=1&cid=4406098.

[66] Lexology, A New Era for the On-Site Inspections by the TCA (Aug. 23, 2023), https://www.lexology.com/library/detail.aspx?g=31016b1d-6615-4bb5-ad85-9a8fd9db3ecf.

[67] FIPAH, Members, https://www.fipah.be/fr/membres/.

French CCA trade association, SYNAD;[68] (c) the Italian CCA trade association, ASSIAD;[69] (d) the Norwegian CCA trade association, NCCA;[70] (e) the Spanish CCA trade association, ANFAH;[71] (f) the Swedish CCA trade association, SACA;[72] (g) the Turkish CCA trade association, KUB;[73] and (h) the UK CCA trade association, CAA.[74] Euclid is also a member of KUB.[75] Each of these trade associations also belongs to an umbrella CCA trade association: EFCA.

83.    EFCA. EFCA describes itself as "a partnership of 13 National Admixture Associations, formed in 1984 in order to represent the interests of the industry."[76] EFCA's membership "provides in excess of 80% of admixture sales within Europe and represents all the major admixture manufacturers."[77]

84.    The current EFCA Executive Board is made up of President Gianluca Bianchin, Vice Presidents Thomas Hirschi and Osman Ilgen, Sustainability Committee Chair Nihal Kinnersley, and Technical Committee Chair Francesco Surico.[78] Thomas Hirschi has worked at Sika since July of 2001 and has served as "Target Market Manager Concrete Waterproofing" for

---

[68] Synad, https://www.synad.fr/synad-syndicat-des-fabricants-d-adjuvants-beton-colorants-fibres.

[69] ASSIAD, The Structure, https://www.assiad.it/LAssociazione/La-struttura.

[70] NCAA, Welcome, https://ncca.no/.

[71] ANFAH, Associate Members, https://anfah.org/anfah/miembros-de-anfah/.

[72] SACA, Member Companies, https://www.saca.se/medlemmar.html.

[73] KUB, About Us, https://kub.org.tr/hakkimizda/.

[74] Cement Admixtures Association, Members, https://www.admixtures.org.uk/members/.

[75] KUB, About Us, https://kub.org.tr/hakkimizda/.

[76] EFCA, About Us, https://www.efca.info/about-us/.

[77] Id.

[78] EFCA, Structure, https://www.efca.info/about-us/efca-structure/.

the company since January of 2017.[79] Osman Ilgen was Managing Director at Chryso from March of 2015 through September of 2023 and has been a Vice President at Saint-Gobain Group since January of 2023.[80] He also currently serves as President of KUB.[81] Nihal Kinnersley has worked as a Product Stewardship Manager at GCP since March of 2016 and as a Product Stewardship Director at Saint-Gobain Group since July of 2023.[82]

85.     Other members of the ECFA Board include Kai Salo of Sika, Claude Le Fur, who worked at Sika until July of 2021, and Suat Seven of Master Builders Group.[83]

86.     Members of the EFCA Technical Committee include Ian Ellis, who worked at Master Builders Group until July of 2022, Marko Kaisanlahti of Master Builders Group, Franz Wombacher of Sika, Trond Solbo of Sika, Osman Tezel of Saint-Gobain Group, Jean-Philippe Bigas of Saint-Gobain Group, and Robert Hurkmans of Saint-Gobain Group.[84]

87.     Members of the EFCA Environmental Committee (which is also referred to as the Sustainability Committee) include Marko Kaisanlahti of Master Builders Group, Maxime Julliot

---

[79] Thomas Hirschi, LinkedIn Profile, https://www.linkedin.com/in/thomas-hirschi-01159b83/?originalSubdomain=ch.

[80] Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr.

[81] *Id.*

[82] Nihal Kinnersley, LinkedIn Profile, https://www.linkedin.com/in/nihal-kinnersley-ba506b22/?originalSubdomain=uk.

[83] EFCA, Committees, https://www.efca.info/efca-committees/; Kai Salo, LinkedIn Profile, https://www.linkedin.com/in/kai-salo-72384880/?originalSubdomain=fi; Claude Le Fur, LinkedIn Profile, https://www.linkedin.com/in/claude-le-fur-a4735857/?originalSubdomain=fr; Suat Seven, LinkedIn Profile, https://www.linkedin.com/in/suat-seven-b9a7403a/?originalSubdomain=tr.

[84] EFCA, Committees, https://www.efca.info/efca-committees/; Ian Ellis, LinkedIn Profile, https://www.linkedin.com/in/ian-ellis-72a94115/?originalSubdomain=uk; Marko Kaisanlahti, LinkedIn Profile, https://www.linkedin.com/in/marko-kaisanlahti-28ab2b116/?originalSubdomain=fi; Franz Wombacher, LinkedIn Profile, https://www.linkedin.com/in/franz-wombacher-9888b941/?originalSubdomain=ch; Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr; Sika Norway, Technical Department/Environment/QEHS, https://nor.sika.com/no/teknisk-avdeling.html; Jean Philippe Bigas, LinkedIn Profile, https://www.linkedin.com/in/jean-philippe-bigas-658a07b5/?originalSubdomain=fr; CHRYSO, Saint-Gobain Weber Beamix Enlarges its Offering in the Netherlands with Weber Cemfloor Screed and Chryso Concrete Admixtures (June 9, 2023), https://www.chryso.com/news/saint-gobain-weber- beamix-enlarges-its-offering-in-the-netherlands-with-weber-cemfloor-screed-and-chryso-concrete-admixtures/.

of Master Builders Group, Mark Schneider, who worked for Sika until October of 2022, Bjorn Stockmann of Sika, Anders Larsson of Sika, and Osman Tezel of Saint-Gobain Group.[85]

88.     **FIPAH**. FIPAH's website declares that it was founded "with the aim of promoting the common interests of the 'Concrete and Mortar Admixtures Industry.'"

89.     **SYNAD**. One of SYNAD's stated goals is to "to establish a relationship between all market players." SYNAD representatives currently serving on EFCA committees include Claude Le Fur, Jean-Philippe Bigas, and Maxime Julliot.[86] Claude Le Fur worked at Sika from 2008 through July of 2021, and his last role was "Manager of Business Development for Europe South and Middle East."[87] Jean-Philippe Bigas began working for Chryso in 2006, and has served as its "Technical Director in charge of regulatory aspects and sustainable development" since June of 2023.[88] Maxime Julliot works as a Market Manager at Master Builders Group.[89]

90.     **ASSIAD**. Part of ASSIAD's mission is to "bring together the interested companies or groups thereof to discuss issues of common interest." The ASSIAD website lists 11 "Consiglio Generale" members, including Leonardo Messaggi of Sika (President), Mario Casali of GCP, Donato Luciano of Chryso, and Roberto Spaggiari of Master Builders Group.[90] On April 9, 2021,

---

[85] EFCA, Committees, https://www.efca.info/efca-committees/; Marko Kaisanlahti, LinkedIn Profile, https://www.linkedin.com/in/marko-kaisanlahti-28ab2b116/?originalSubdomain=fi; Mark Schneider, LinkedIn Profile, https://www.linkedin.com/in/mark-schneider-157a57108/?originalSubdomain=ch; Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr; Bjorn Stockmann, LinkedIn Profile, https://www.linkedin.com/in/bj%C3%B8rn-stockmann-52346034/?originalSubdomain=no; Andres Larsson, LinkedIn Profile, https://www.linkedin.com/in/anders-larsson-3278731b7/?originalSubdomain=se; Master Builders Solutions, Meet Our Team, https://masterfiber.master-builders-solutions.com/contact/contact.

[86] EFCA, Committees, https://www.efca.info/efca-committees/.

[87] Claude Le Fur, LinkedIn Profile, https://www.linkedin.com/in/claude-le-fur-a4735857/?originalSubdomain=fr.

[88] Jean   Philippe Bigas, LinkedIn Profile, https://www.linkedin.com/in/jean-philippe-bigas-658a07b5/?originalSubdomain=fr.

[89] Master Builders Solutions, Meet Our Team, https://masterfiber.master-builders-solutions.com/contact/contact.

[90] ASSIAD, The Structure, https://www.assiad.it/LAssociazione/La-struttura.

ASSIAD announced four new members of the ASSIAD Board, including Donato Luciano of Master Builders Group, Jean Mascaro of Chryso, and Leonardo Messaggi of Sika.[91]

91.     On July 21, 2023, ASSIAD announced that Leonardo Messaggi of Sika was elected President of ASSIAD for the period from 2023 to 2027.[92] Leonardo Messaggi has worked for Sika since 2016 and currently serves as "Target Market Manager for Concrete & Industrial Flooring."[93] In addition, Paolo Novello of Chryso serves as the Vice President of ASSIAD.[94]

92.     On October 4, 2023, ASSIAD announced the creation of a new Technical Evolution Committee made up of 13 members, including Fabrizio Avallone and Cristiano Cereda of Sika, Mario Casali and Pietro Massinari of Chryso, and Ivana Torresan of Master Builders Group.[95]

93.     On October 5, 2023, Messaggi announced that the thirteen (13) members of the new Technical Evolution Committee would participate in roundtables at the first "General States of Concrete Technology" at SAIE Bari, an industry meeting, in October of 2023.[96] Sika, Chryso,

---

[91] Press Release, ASSIAD, Two New Additions to the General Council (Apr. 9, 2021), https://www.assiad.it/News/due-nuovi-ingressi-nel-consiglio-generale.

[92] Press Release, ASSIAD, ASSIAD Announces the Election of the New President and Vice Presidents for the Four-Year period 2023-2027 (July 21, 2023), https://www.assiad.it/News/assiad-annuncia-lelezione-del-nuovo-presidente-e-dei-vicepresidenti-per-il-quadriennio-2023-2027.

[93] Leonardo Messaggi, LinkedIn Profile, https://www.linkedin.com/in/leonardo-messaggi-5b949670/?locale=en_US.

[94] ASSIAD, The Scientific Steering Committee and Technical Evolution Committee of ASSIAD are Born (Oct. 4, 2023), https://www.assiad.it/News/nascono-il-comitato-di-indirizzo-scientifico-e-comitato-evoluzione-tecnica-di-assiad; Ingenio, Concrete and Construction Post-Covid: Companies are Ready to Adopt the "Circular Economy" (July 29, 2020), https://www.ingenio-web.it/articoli/calcestruzzo-e-edilizia-post-covid-le-imprese-sono-pronte-ad-adottare-la-circular-economy/; Arketipo, ICARE Cement Technology by Chryso (Aug. 28, 2020), https://www.arketipomagazine.it/tecnologia-per-il-cemento-icare-by-chryso/; Paolo Novello, LinkedIn Profile, https://www.linkedin.com/in/paolo-novello-bab315b2/?originalSubdomain=it.

[95] ASSIAD, The Scientific Steering Committee and Technical Evolution Committee of ASSIAD are Born (Oct. 4, 2023), https://www.assiad.it/News/nascono-il-comitato-di-indirizzo-scientifico-e-comitato-evoluzione-tecnica-di-assiad.

[96] Ingenio, ASSIAD Among the Protagonists at the General States on Concrete Technology at SAIE Bari 2023 (Oct. 5, 2023), https://www.ingenio-web.it/articoli/assiad-tra-i-protagonisti-agli-stati-generali-della-tecnologia-del-calcestruzzo-al-saie- bari-2023/.

GCP, and Master Builders Group were all scheduled to participate as "exhibitors" at this meeting.[97]

94.     NCCA. NCCA representatives currently serving on EFCA committees include Trond Solbo and Bjorn Stockmann, who both work for Sika.[98] As explained herein, these Sika employees met with executives from other Defendants in their roles as EFCA committee members.

95.     **ANFAH**. ANFAH members represent "around 90% of the admixtures used in Spain."[99]

96.     **SACA**. SACA representatives currently serving on EFCA committees include Anders Larsson, who works for Sika.[100] As explained herein, Anders Larsson met with executives from other Defendants in his role as an EFCA committee member.

97.     **KUB**. KUB boasts that it "dominates 80% of the Turkish market," which itself makes up 40% of the total concrete admixture market in Europe.[101] On March 13, 2020, KUB announced that Turgay Ozkun, a General Manager at Sika, had been elected as Chairman of the Board. At the same time, Osman Ilgen, a Vice President with Saint-Gobain Group, was elected

---

[97] *Id.*

[98] SAIE, Exhibitor Preview, https://eventi.senaf.it/preview-espositori.php?CSRFName=CSRFGuard_330546167&CSRFToken=7908882XTY66GK7IT8RA8XB7KGFK67N WMU5BCCD

DP5O0T8VC1XGIJSJ3T8EOOB7B&rag_soc=master+builders&rag_soc_inizia=&settore=&ide=1816&action=rei mposta.

[99] EFCA, Spain – ANFAH, https://www.efca.info/efca-members/spain-anfah/.

[100] EFCA, Committees, https://www.efca.info/efca-committees; Anders Larsson, LinkedIn Profile, https://www.linkedin.com/in/anders-larsson-3278731b7/?originalSubdomain=se.

[101] KUB, About Us, https://kub.org.tr/hakkimizda/.

as Vice President of the Board, and Suat Seven of Master Builders Group was also elected to the Board.[102] Osman Ilgen currently serves as both President of KUB and Vice President of EFCA.[103]

98.    **CAA**. Two Master Builders Group executives currently hold leadership positions in the CAA: Chris Fletcher, a Master Builders Group Managing Director, is Chairman of the CAA Council, which "[e]stablishes and implements policy, promotes admixture use, [and] manages [CAA's] committees, task groups, and finances," while Ian Ellis, formerly a Master Builders Group Technical Services Manager, is Chairman of the CAA Technical Committee, which "[s]upports work on UK and European Standards, Codes, and Certification [and] [p]romotes improvements in technical information, quality control, and level of technical support provided by CAA members."[104] Ian Ellis is also a member of the EFCA Technical Committee.[105]

### E.    The Prices for Defendants' CCAs Have Climbed Exponentially During the Class Period and Several Defendants Have Signaled Price Increases Publicly

#### 1.    Defendants Have Exponentially Increased Their Prices on CCAs During the Class Period, Including by Imposing Surcharges

99.    Publicly available financial reports and statements suggest that Defendants have consistently raised their prices for CCAs, including through surcharges, during the Class Period.

100.    For example, during an earnings call in April of 2022, RPM VP, Controller, and CAO Michael Laroche pointed to Euclid Group's concrete admixtures as one of the company's

---

[102] EFCA, New KUB President, https://www.efca.info/2020/03/13/new-kub-president/; Stuat Seven, LinkedIn Profile, https://www.linkedin.com/in/suat-seven-b9a7403a/?originalSubdomain=tr.

[103] Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr; EFCA, Structure, https://www.efca.info/about-us/efca-structure/.

[104] Cement Admixtures Association, CAA Structure, https://www.admixtures.org.uk/about-us/caa-structure/; Chris Fletcher, LinkedIn Profile, https://www.linkedin.com/in/chris-fletcher-84685137/?originalSubdomain=uk; Ian Ellis, LinkedIn Profile, https://www.linkedin.com/in/ian-ellis-72a94115/?originalSubdomain=uk.

[105] EFCA, Committees, https://www.efca.info/efca-committees/.

"fastest-growing businesses" and cited "selling price increases" as a key growth factor.[106] One year later, in an earnings release published in April of 2023, RPM noted that "record" sales in its construction segment were "driven by price increases and strength in concrete admixtures."[107]

101.   An investor report published by Saint-Gobain Group in February of 2021 cited "[u]pward trends in sales prices" as a key driver of the company's sales growth in 2020.[108] The same report published one year later similarly noted an "acceleration in prices in all segments" in 2021.[109] The report emphasized that Saint-Gobain Group had exhibited "strong pricing power and decisive execution" in raising its prices by as much as 10% to match the industry trend.[110] A press release published by Saint-Gobain Group in October of 2021 included a chart showing an average price increase of 9.7% across all of its segments over the previous two years.[111] In the Americas, Saint-Gobain's prices increased by 18.6% from October of 2019 to October of 2021.[112]

102.   Defendants have also signaled CCA price increases publicly during the Class Period. Examples are set forth below.

---

[106] RPM, Q3 2022 Earnings Call Transcript (Apr. 6, 2022), https://www.rpminc.com/media/3483/rpm-usq_transcript_2022- 04-06.pdf.

[107] RPM, RPM Reports Record Fiscal 2023 Third-Quarter Results (Apr. 6, 2023), https://www.rpminc.com/media/4672/q3- 23-rpm-earnings-release-final.pdf.

[108] Saint-Gobain, FY 2020 Results and Outlook (Feb. 26, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/fy-2020-ang-a_0.pdf.

[109] Saint-Gobain, FY 2021 Results and Outlook (Feb. 25, 2022), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/FY2021_ENG.pdf.

[110] Id.

[111] Saint-Gobain, Press Release (Oct. 28, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CP_CA_9M_2021_VA.pdf.

[112] Id.

103.    In February of 2019, Sika CEO Paul Schuler announced that Sika would raise its prices for the second time that year: "We are going to increase prices further. We have increased prices in January and we will do it again in March."[113]

104.    On November 13, 2020, Master Builders Group announced that it would raise its CCA prices up to 10%, effective immediately.[114]

105.    On July 20, 2021, Masters Builders Group announced that it would be increasing previously-imposed surcharges on its products, including on CCAs, from six percent (6%) to nine percent (9%).[115]

106.    On November 29, 2021, GCP announced that it would raise its CCA prices up to 10% for North American customers, effective in January of 2022.[116]

107.    On January 14, 2022, Master Builders Group announced that it would be increasing previously-imposed surcharges on its products, including on CCAs, to be as high as forty percent (40%).[117]

---

[113] Reuters, Sika Raises Prices to Counter Jump in Raw Material Costs (Feb. 22, 2019), https://www.reuters.com/article/sika- results-materials/sika-raises-prices-to-counter-jump-in-raw-material-costs-idUSZ8N1UN01Y/.

[114] Sika, Master Builders Solutions to Increase Prices for Construction Chemicals (Nov. 13, 2020), https://mbcc.sika.com/en-vn/about-us/news/price-increase-announcement.

[115] Letter from Konrad Wernthaler, Senior Vice President at Master Builders Group, to Customers (July 20, 2021), https://www.negwer.com/Portals/0/Documents/Vendor%20News/2021%20Price%20Increases/2021_07_20_Master%20Builder%20Solutions%20Surcharge%20Letter_EN.pdf?ver=2021-07-21-080522-810.

[116] Concrete Products, Raw Material, Freight Costs Drive GCP Admixture Price Increase (Nov. 29, 2021), https://concreteproducts.com/index.php/2021/11/29/raw-material-freight-costs-drive-gcp-admixture-price-increase/#:~:text=GCP%20Applied%20Technologies%20will%20raise,American%20customers%2C%20effective%20January%202022.

[117] Letter from Konrad Wernthaler, Senior Vice President at Master Builders Group, to Customers (Jan. 14, 2022), https://www.glenrockcompany.com/wp-content/uploads/2022/01/LtrForWebsite-Jasn27_2022.pdf.

108.   Also in January of 2022, Sika announced it, too, would be increasing its previously-imposed surcharges on its products, including CCAs, from sixteen percent (16%) to twenty percent (20%).[118]

109.   These announcements were publicly disseminated and received substantial news coverage.

110.   Indeed, in an article published in August of 2020, an industry consultant noted that despite declining sales in the construction industry, the United States had seen an increase of eleven percent (11%) in the construction-cost-index (CCI), including a four percent (4%) increase in prices for products made of concrete.[119] He explained that "[t]he fall in prices feared in many branches, like automotive or plant engineering, is not noticeable in the construction sector."[120] The consultant went on to suggest that players in construction-related industries should continue to raise their prices.[121]

111.   On information and belief, the average price of CCAs imported into the United States also climbed during the Class Period. Prices for CCAs imported in the United States and its territories track the prices for CCAs exported from European countries. Similarly, prices for CCAs imported into the United States and its territories closely track prices for CCAs imported into European countries.

112.   In sum, Defendants' price increases and surcharges have resulted in the prices for CCAs sold in the United States and its territories to increase dramatically during the Class Period.

---

[118] Letter from Michal Mastro, Vice President at Sika, to Customers (Jan. 2022), https://www.glenrockcompany.com/wp- content/uploads/2022/01/LtrForWebsite-Jasn27_2022.pdf.

[119] ZKG Cement, Smart Pricing Strategies in the Pandemic, https://www.zkg.de/en/artikel/zkg_Smart_pricing_strategies_in_the_pandemic-3562339.html.

[120] *Id.*

[121] *Id.*

Specifically, prices for CCAs sold in the United States and its territories have roughly doubling during the Class Period.

**2.    Normal Market Forces Do Not Explain Defendants' Price Increases or Surcharges**

113.    Defendants have justified their price increases during the Class Period by citing increases in input costs and supply chain constraints. For example, when Master Builders Group raised prices for its CCAs by as much as 10% in November of 2020, the company blamed "supply constraints in key raw materials" and "an increase in raw material cost and several other related costs including freight." In explaining GCP's decision to raise its CCA prices by 10% in January of 2022, GCP Specialty Construction Chemicals President David Campos stated, "The global supply chain impacts on raw material and freight costs have been unprecedented over the past six months and input costs are not expected to subside in the near-term."[122] RPM's Laroche similarly justified price increases as necessary "to offset significant raw material inflationary pressure."[123]

114.    However, Defendants' material price increases for and imposition of surcharges on CCAs cannot be explained by normal market forces. The prices for other raw materials for CCAs have decreased during the Class Period.[124] Similarly, ocean freight rates spiked sharply and briefly during Covid, particularly for trans-Atlantic cargo, but have since fallen dramatically.[125]

---

[122] Concrete Products, Raw Material, Freight Costs Drive GCP Admixture Price Increase (Nov. 29, 2021), https://concreteproducts.com/index.php/2021/11/29/raw-material-freight-costs-drive-gcp-admixture-price-increase/#:~:text=GCP%20Applied%20Technologies%20will%20raise,American%20customers%2C%20effective%20January%202022.

[123] RPM, Q4 2022 Earnings Call Transcript (July    25, 2022), https://www.rpminc.com/media/3784/rpm-usq_transcript_2022-07-25.pdf.

[124] ChemAnalyst, Sodium Lignosulphonate Price Trend and Forecast, https://www.chemanalyst.com/Pricing-data/sodium-lignosulphonate-1140.

[125] Freight Waves, Trans-Atlantic shipping rates keep sinking as imports from Europe fall (Apr. 28, 2023), https://www.freightwaves.com/news/trans-atlantic-shipping-rates-keep-sinking-as-imports-from-europe-fall.

115.   Raw materials cost increases alone do not explain Defendants' CCA price increases, including surcharges, during the Class Period. The timing and duration of the raw materials cost increases do not fully align with the CCA price increases. Moreover, while some CCA raw materials saw higher prices, others were flat or declined. Similarly, the increase in freight costs during Covid was short-lived, stabilizing after a few months before beginning to decrease. The duration of shipping cost increases does not explain the persistent increase in CCA prices, including surcharges, since 2019.

### 3.   Defendants Have Admitted Normal Market Forces Do Not Explain Their Price Increases or Surcharges

116.   Defendants have admitted that their higher profit margins were driven by price increases that outpaced any increases in input costs.

117.   For example, during Saint-Gobain Group's earnings call in July of 2019, CFO Sreedhar N. noted that Saint-Gobain Group had "remained focused on price in spite of … the fact that there was a lower trend in the inflation."[126] He explained that keeping prices high had helped the company "not only to offset the inflation," but also to maintain a "positive spread" and, therefore, increased profits.[127] Over the next two years, Saint-Gobain Group continued to raise its prices and increase its profits. A press release from October of 2021 explained that Saint-Gobain Group was "confident that it w[ould] be able to offset raw material and energy cost inflation over full-year 2021" given "the sharp 8.7% acceleration in prices" over the previous year, as well as "the new price increase announcements in Europe and in the [United States].[128]

---

[126] Compagnie de Saint-Gobain, First-Half 2019 Earnings Call Transcript (Jul. 26, 2019), https://seekingalpha.com/article/4278326-compagnie-de-saint-gobains-codgf-ceo-pierre-andre-de-chalendar-on-first-half-2019-results.

[127] *Id.*

[128] Saint-Gobain, Press Release (Oct. 28, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CP_CA_9M_2021_VA.pdf.

118.   Similarly, Sika CFO Adrian Widmer admitted during an earnings call in February of 2020 that the impact of increases in raw material costs was "only . . . marginal," and that Sika had continued to improve its material margin by remaining "very much . . . focused on pricing."[129] During another earnings call one year later, Widmer explained that Sika's material margin of 54.8% in 2020 was "supported by decreasing raw material costs . . . in combination with disciplined pricing," which allowed it to "add[] 50 basis points in price effect."[130]

119.   RPM's Sullivan bragged about his company's ability to maintain its high pricing when asked whether Euclid Group intended to cut its prices due to recent, slumping demand: "In the past cycles, we've been able to maintain the vast majority of the price increases that we've initiated, and we would expect to do exactly the same thing here. If you look at our performance in past commodity cycles on the down cycle, we should pick up $100 million to $200 million of margin benefit and we're working hard to do that, and we intend to do it."[131]

120.   Several Defendants have cited their "pricing discipline" in explaining profit margin increases to investors.

121.   For example, Sika CEO Thomas Hasler explained that the "remarkable" increase in Sika's material margin in the first half of 2023 was "a result of our pricing discipline and

[129] Sika AG, Full Year 2019 Earnings Call Transcript (Feb. 21, 2020), https://seekingalpha.com/article/4326363-sika-ag-sxyay-ceo-paul-schuler-on-full-year-2019-results-earnings-call-transcript.

[130] Sika AG, Q4 2020 Earnings Call Transcript (Feb. 20, 2021), https://seekingalpha.com/article/4407686-sika-ag-sxyay-ceo-paul-schuler-on-q4-2020-results-earnings-call-transcript (emphasis added).

[131] RPM, Q2 2023 Earnings Call Transcript (Jan. 5, 2023), https://www.rpminc.com/media/4564/rpm-usq_transcript_2023-01-05.pdf.

excellence."[132] This was echoed in Sika's 2023 Half-Year Report, which reported "disciplined sales price management," coupled with lower costs, as improving its gross margin.[133]

122.    Similarly, in an October of 2021 press release, Saint-Gobain Group cited a "[c]onstant focus on the price-cost spread" and "strong pricing discipline amid strong inflation" as its "strategic priorities" for 2021.[134]

123.    And in July of 2023, when an analyst asked RPM's Sullivan what had driven the "significant increase" in profit margin for RPM's construction segment in the prior quarter, Sullivan boasted about Euclid Group's pricing discipline: "[W]e had a few distributors that were hinting at … we can boost some product if you discount. And I think we held our pricing and held our discipline. And let's say everybody held their breath until they needed inventory, and it started showing up in May. And that positive trend is continuing as we enter the first quarter."[135]

## F.    Defendants Have Consolidated Their Control Over CCAs

124.    Beginning at least as early as 2014, Compagnie de Saint-Gobain S.A. launched a hostile takeover of Sika AG.[136] Between 2014 and 2018, Compagnie de Saint-Gobain S.A. acquired almost 25% of Sika AG's stock and was the single largest shareholder.[137] However, on

---

[132] Sika AG, Q2 2023 Earnings Call Transcript (Aug. 4, 2023), https://seekingalpha.com/article/4624149-sika-ag-sxyay-q2-2023-earnings-call-transcript.

[133] Sika, Half-Year Report (2023), 19 https://www.sika.com/content/dam/dms/corporate/media/glo-hy-2023-half-year-report.pdf?_gl=1*1smz2e5*_ga*MjA0NzgwMDU4NC4xNjk3ODI0MDYx*_ga_K04G1QB2XC*MTcwMDIzNDU0NC40LjEuMTcwMDIzNDU2OS4wLjAuMA (emphasis added).

[134] Saint-Gobain, Press Release (Oct. 28, 2021), https://www.saint-gobain.com/sites/saint-gobain.com/files/media/document/CP_CA_9M_2021_VA.pdf (emphasis added).

[135] RPM Q4 2023 Earnings Call Transcript (Jul. 26, 2023), https://www.rpminc.com/media/4837/rpm-q4-23-transcript.pdf (emphasis added).

[136] Saint-Gobain Remains Committed to Deal to Take over Sika, https://www.reuters.com/article/us-sika-cie-saint-gobain-idUSKBN1300II (last updated Nov. 5, 2016).

[137] Market Watch, Saint-Gobain, Sika and Burkard Family End Dispute (May 11, 2018), https://www.marketwatch.com/story/saint-gobain-sika-and-burkard-family-end-dispute-2018-05-11; VY Tyndall Global Select Fund Commentary, 5 (Oct. 2019), https://www.tyndallim.co.uk/wp-content/uploads/2019/11/1910-

May 11, 2018, Compagnie de Saint-Gobain S.A. abandoned its takeover attempt, and agreed to reduce its stake to more than ten percent, which it agreed to hold for at least two years.[138] Before selling its Sika AG stock in 2020, Compagnie de Saint-Gobain S.A. was the largest shareholder in Sika AG.[139]

125.    As this merger began to falter, Compagnie de Saint-Gobain S.A. and Sika AG, through their shared ownership and financial interests, began a coordinated campaign of buying up their smaller competitors. At all times, these efforts were aided and abetted by Cinven, a private equity firm with substantial investments in the CCA space. Euclid Group joined in its co-conspirators' consolidation efforts no later than April of 2022.

126.    With regard to Compagnie de Saint-Gobain S.A. and beginning in March of 2017, Cinven acquired Chryso.[140] In the months that followed, Chryso, under the ownership and control of Cinven, acquired at least four competing CCA manufacturers,[141] including Italy's Ruredil in

---

VT-Tyndall-Global-Select-Fund-Commentary.pdf; Saint-Gobain Sells Sika Stake, Formally Ending Bitter Takeover Battle, https://www.reuters.com/article/us-sika-m-a-saintgobain/saint-gobain-sells-sika-stake-formally-ending-bitter-takeover-battle-idUSKBN2331J1 (last updated May 27, 2020).

[138] Market Watch, Saint-Gobain, Sika and Burkard Family End Dispute (May 11, 2018), https://www.marketwatch.com/story/saint-gobain-sika-and-burkard-family-end-dispute-2018-05-11; Saint-Gobain's U.S. Deal will Cement its Sika Envy, https://www.reuters.com/breakingviews/saint-gobains-us-deal-will-cement-its-sika-envy-2021-12-06/   (last updated Dec. 6, 2021).

[139] VY Tyndall Global Select Fund Commentary, 5 (Oct. 2019), https://www.tyndallim.co.uk/wp-content/uploads/2019/11/1910-VT-Tyndall-Global-Select-Fund-Commentary.pdf; Saint-Gobain Sells Sika Stake, Formally Ending Bitter Takeover Battle, https://www.reuters.com/article/us-sika-m-a-saintgobain/saint-gobain-sells-sika-stake-formally-ending-bitter-takeover-battle-idUSKBN2331J1 (last updated May 27, 2020).

[140] CHRYSO, Completion of the Acquisition of Chryso by Cinven (July 8, 2017), https://www.chrysogulf.com/news/83/completion-of-the-acquisition-of-chryso-by-cinven.

[141] Cinven, Cinven to Sell Chryso to Saint Gobain (May 20, 2021), https://www.cinven.com/media/news/cinven-to-sell-chryso-to-saint-gobain.

June of 2018,[142] Portugal's Euromodal in October of 2018,[143] Ireland's Chemtec in October of 2018,[144] and Morocco's Aptex in October of 2020.[145] Compagnie de Saint-Gobain S.A. acquired Chryso from Cinven in September of 2021, and then, just three months later, in December of 2021, acquired GCP.[146]

127.    Compagnie de Saint-Gobain S.A. subsequently consolidated its management of these earlier-competitors under the control of a newly-created "Construction Chemicals Business Unit" and appointed the incumbent Chryso President, Steve Williams, as the President of this unit,[147] and incumbent Chryso CEO, Thierry Bernard (who was previously employed by Cinven), as the General Manager of this unit.[148] Compagnie de Saint-Gobain S.A. has combined Chryso and GCP's manufacturing and sale of CCAs, such that these former competitors now operate as a single, combined unit.[149]

---

[142] Cinven, Chryso to Acquire Certain Ruredil assets and Enlarges its Offering for Construction Materials in Italy (June 28, 2018), https://www.cinven.com/media/news/chryso-to-acquire-certain-ruredil-assets-and-enlarges-its-offering-for-construction- materials-in-italy/.

[143] Cinven, Chryso Acquires Euromodal and Enlarges its Offering for Construction Materials in Portugal (Oct. 19, 2018), https://www.cinven.com/media/news/chryso-acquires-euromodal-and-enlarges-its-offering-for-construction-materials-in- portugal/.

[144] CHRYSO, Chryso Acquires Chemtec Admixtures Limited in Ireland (Oct. 3, 2018), https://uk.chryso.com/news/195/chryso-acquires-chemtec-admixtures-limited-in-ireland.

[145] CHRYSO Chryso Strengthens its Presence in Morocco with Aptex (Oct. 15,  2020), https://www.chryso.com/news/chryso-strengthens-its-presence-in-morocco-with-aptex/.

[146] Chemical & Engineering News, Saint-Gobain to Buy Construction Chemical Maker GCP for $2.3 Billion (Dec. 7, 2021), https://cen.acs.org/business/specialty-chemicals/Saint-Gobain-buy-construction-chemical/99/web/2021/12.

[147] Business Wire, Steve Williams Appointed President of the Newly Created Construction Chemicals Business Unit for North America (Oct. 17, 2022), https://www.businesswire.com/news/home/20221012005926/en/Steve-Williams-Appointed-President-of-the-Newly-Created-Construction-Chemicals-Business-Unit-for-North-America.

[148] CHRYSO, New Business Unit Within Saint-Gobain High Performance Solutions: Constructions Chemicals (Oct. 3, 2022), https://www.chryso.com/news/new-business-unit-within-saint-gobain-high-performance-solutions-construction- chemicals/.

[149] Concrete Products, Saint-Gobain Institutes Integrated Chryso, GCP Production Strategy (July 3, 2023), https://concreteproducts.com/index.php/2023/07/03/saint-gobain-institutes-integrated-chryso-gcp-production-strategy/; Concrete Products, Saint-Gobain Proceeds with Integrated Chryso, GCP Production (Aug. 14, 2023).

128.    With regard to Sika AG and beginning in late 2018, Sika AG expressed an interest in acquiring Master Builders Group, which at the time, was owned by BASF.[150] But after acquiring another major competitor in the CCA space—France's Parex— in January of 2019,[151] Sika AG initially abandoned its interest in Master Builders Group because, according to its CEO, it did "not believe a deal for all the company would be possible because of anti-trust concerns by regulators."[152] BASF eventually sold Master Builders Group to another hedge fund (Lone Star) for €3.17 billion, the sale of which closed in the third quarter of 2020.[153]

129.    Then, just one year later, in November of 2021, Sika AG announced that it would be acquiring Master Builders Group for $5.9 billion – nearly double what Lone Star had paid for it.[154] However, due to "competition concerns" raised by the UK's CMA, Cinven (which, as noted above, had just sold Chryso to Compagnie de Saint-Gobain S.A.) acquired MBSD's United States assets, including MBSA, in early 2023.[155] Specifically, MBSD's assets were split into two parts: the first, which encompassed MBSD's assets in the UK, United States, Canada, Europe, Australia, and New Zealand, was sold to Cinven; and the second, which encompassed MBSD's assets in the

---

[150] Sika Interested in Parts of BASF's Construction Chemical Business, https://www.reuters.com/article/us-sika-ceo-basf/sika-interested-in-parts-of-basfs-construction-chemicals-business-idUSKCN1QB1CP (last updated Feb. 22, 2019).

[151] CVC, Sika Makes Binding Offer to Acquire Parex (Jan. 8, 2019), https://www.cvc.com/media/news/2019/2019-01-08-sika-makes-binding-offer-to-acquire-parex/.

[152] BRIEF-Sika CEO Rules out Deal for Whole BASF Construction Chemical Business, https://www.reuters.com/article/brief-sika-ceo-rules-out-deal-for-whole/brief-sika-ceo-rules-out-deal-for-whole-basf-construction-chemical-business-idUKZ8N1UN017 (last updated Jan. 8, 2019).

[153] Concrete Construction, Lone Star Funds to Acquire Master Builders (Dec.    27, 2019), https://www.concreteconstruction.net/products/concrete-construction-materials/lone-star-funds-to-acquire-master-builders_c#:~:text=BASF%20has%20finally%20found%20a,of%20BASF's%20Construction%20Chemicals%20business.

[154] Chemical Engineering, Sika to Acquire MBCC Group for €5.2 billion (Nov. 11, 2021), https://www.chemengonline.com/sika-to-acquire-mbcc-group-for-e5-2-billion/?printmode=1.

[155] Adhesives & Sealants Industry, Sika to Sell MBCC Group's Chemical Admixture Assets to Cinven (Mar. 27, 2023), https://www.adhesivesmag.com/articles/100079-sika-to-sell-mbcc-groups-chemical-admixture-assets-to-cinven.

rest of the World, was sold to Sika AG. While this arrangement appeared to appease antitrust regulators around the World, it was soon revealed that it yielded anticompetitive effects. Sika has admitted that it views Cinven as its partner, not its competitor. Remarking on the spin-off, Sika's CEO, Thomas Hasler, remarked, "Cinven with its extensive expertise in this sector is an ideal partner for continuing the successful growth path of this business. . . ."[156] Hasler also bragged about Sika's dominance in the concrete admixture industry following the deal with MBSD, stating that its "product offering in the segment of concrete admixture is super strong and almost [] unchallengeable by others because we now have really the full innovation pipeline for the future ready and also very strong backup with the supply chain that is coming together."[157]

130.   With regard to Euclid Group, in November of 2021, RPM acquired J.W. Brett Inc. d/b/a Brett Admixtures, and in April of 2022,[158] RPM acquired Chryso's North American cement grinding aids and additives business from Saint-Gobain Group.[159]

131.   Sika AG, Compagnie de Saint-Gobain S.A., and RPM's expensive acquisitions of their competitors at a time when raw material costs for CCAs were allegedly skyrocketing makes little economic sense absent a conspiracy to artificially inflate the price of CCAs, such as that alleged here. Indeed, the huge sums paid for these competitors is all the more surprising in light of the trouble that BASF had in unloading Master Builders Group a short time prior.

---

[156] Saint-Gobain's U.S. Deal will Cement its Sika Envy, https://www.reuters.com/breakingviews/saint-gobains-us-deal-will-cement-its-sika-envy-2021-12-06/ (last updated Dec. 6, 2021) (emphasis added).

[157] Sika AG, Q2 2023 Earnings Call Transcript (Aug. 4, 2023), https://seekingalpha.com/article/4624149-sika-ag-sxyay-q2-2023-earnings-call-transcript.

[158] RPM International, Proxy Statement (Aug. 24, 2022), https://www.rpminc.com/media/3815/proxy-statement.pdf.

[159] *Id.*

### G. The Structure and Characteristics of the Market for CCAs Support the Existence of a Conspiracy

132. The structure and other characteristics of the market for CCAs make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

#### 1. The Supply Side of the CCA Market Is Highly Concentrated, and the Defendants Are the Dominant Firms

133. The presence of a small group of major sellers is one of the conditions that the DOJ has identified as being favorable to collusion.[160] Put differently, a highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

134. As the DOJ has noted, "mergers can reduce choices for consumers, workers, and other businesses, leaving them increasingly dependent on larger and more powerful firms that have purchased greater power to dictate the terms of their deals."[161] Indeed, the DOJ updated its Merger Guidelines in 2023 to better address the economic consequences of anticompetitive mergers because, as Attorney General Merrick Garland noted, "unchecked consolidation threatens the free and fair markets upon which our economy is based."[162]

135. The Defendants that were targeted in dawn raids by European antitrust regulators, Defendants Sika, Saint-Gobain Group, and Master Builders Group, are among the largest producers of CCAs in the World, as well as in the United States and its territories.[163]

---

[160] Justice.gov, Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For, https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

[161] Press Release, Office of Public Affairs, U.S. Department of Justice, Justice Department and Federal Trade Commission Seek to Strengthen Enforcement Against Illegal Mergers (Jan. 18, 2022), https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-seek-strengthen-enforcement-against-illegal (emphasis added).

[162] Press Release, Office of Public Affairs, U.S. Department of Justice, Justice Department and FTC Seek Comment on Draft Merger Guidelines (July 19, 2023), https://www.justice.gov/opa/pr/justice-department-and-ftc-seek-comment-draft-merger-guidelines.

[163] Industry ARC, Concrete Admixtures Market – Forecast 2023–2028, https://www.industryarc.com/Report/15114/concrete-admixtures-

136. Other manufacturers of CCAs do not meaningfully compete with Defendants. Several of these other, smaller manufacturers of CCAs told the CMA that even if they wanted to compete with the Defendants, they would not be able to do so effectively because of challenges in scaling up their operations, as well as the reluctance of CCA purchasers to switch from their existing CCA manufacturer(s).[164]

137. In fact, at least some of the Defendants' internal documents indicate that they consider the other Defendants to be their only close competitors.[165]

138. Because the manufacture of CCAs is highly concentrated, with the Defendants controlling the vast majority of production, this market is highly susceptible to collusion.

## 2.    Barriers to Entry Are High

139. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market.

140. There are high barriers to entry to effectively compete in the manufacture of CCAs, including the following: (a) the time and cost associated with effectively scaling CCAs manufacturing operations (i.e., building new production and storage facilities in closer proximity to CCA purchasers); (b) the research and development investment required to develop new products (i.e., polymers), and then support their introduction into the market; (c) sellers of the raw materials necessary to manufacture CCAs (i.e., polymers) favor the larger, entrenched

---

market.html#:~:text=Major%20players%20in%20the%20Concrete,ve%20Tic.&file=/fileadmin/symrise/Downloads_reports/reports/documents/2023/230308-Symrise-Financial-Report-2022.pdf#page=14.

[164] Id. at ¶¶ 107. 113, 118CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶¶ 136, 118, (Sept. 23, 2022).

[165] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 89, 96, 101 (Sept. 23, 2022).

manufacturers of CCAs; and (d) the long-standing, existing relationships between CCA manufacturers and customers.[166]

141.   These high barriers to entry are amplified by the difficulty purchasers of CCAs have in switching manufacturers once selected. This is because smaller suppliers of CCAs cannot quickly build up their scale and capacity for potentially-switching customers,[167] and because supply contracts typically have a term of one to three years.[168] Purchasers of CCAs thus face switching costs and are frequently locked-in to purchasing CCAs from the Defendants in this case – the three largest manufacturers and sellers of CCAs in the World, including in the United States and its territories.[169]

142.   The CMA, in determining that the acquisition by Sika AG of MBSD would be anticompetitive, noted as follows: "There are significant barriers to entry and expansion and, although a number of suppliers have expansion plans, these will not have a significant enough effect on the structure of the market to prevent an SLC ["Substantial Lessening of Competition"] even if these plans materialise."[170]

143.   The high barriers to entry in the manufacture of CCAs make it unlikely that supra-competitive prices would result in new competitors entering the market. These high barriers to entry also make the market more susceptible to collusion.

---

[166] Id. at ¶ 128.

[167] Id. at ¶ 50.

[168] CMA, Provisional Findings Report, ¶6.50 (Oct. 25, 2022).

[169] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 50 (Sept. 23, 2022).

[170] CMA, Anticipated Acquisition by Sika AG of MBCC, Group Decision to Refer (Aug. 10, 2022), https://assets.publishing.service.gov.uk/media/63469a408fa8f53465d139b4/Decision_to_refer_full_text_Sika-MBCC_.pdf.

### 3.    The Demand Side of the CCA Market Is Unconcentrated

144.    The unconcentrated nature of the demand side of the CCA market also makes this market susceptible to collusion.

145.    In 2021, there were nearly 9,000 concrete and cement product manufacturing establishments in the United States and its territories.[171]

146.    Such a large number of buyers, each of whom forms a small share of the total marketplace, means that there is less incentive for Defendants to cheat on collusive pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

### 4.    Demand for CCAs Is Inelastic

147.    Industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices. There are three primary characteristics that demonstrate the inelasticity of demand for CCAs: (a) a lack of substitute goods, (b) the essential nature of CCAs in cement, concrete, and mortar, and (c) CCAs being a small portion of the overall cost of the final good.

### a.    There are No Substitutes for CCAs

148.    The DOJ has also recognized that standardized products which lack substitutes is a condition favorable to collusion, as substitute goods can serve to restrain price increases and temper the effects of a price-fixing conspiracy.[172]

---

[171] Census.Gov, 2021 County      Business Patterns (CBP) Data, https://www.census.gov/programs-surveys/cbp/data/tables.html (last updated May 19, 2022).

[172] Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For (justice.gov), https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

149.    Purchasers of CCAs do not generally view CCAs as interchangeable, nor do purchasers view there as being substitutes for CCAs.[173]

150.    In addition, and as set forth above, purchasers of CCAs face high switching costs as between specific CCAs. This is the case for at least three reasons. First, "extensive testing is required to ensure that any new [CCA] products are suitable for [the customer's] particular aggregates and requirements, with this process becoming more difficult the larger and more complex a [CCA] customer's operations are."[174] Second, purchasers of CCAs frequently have to obtain their own customers' approval before switching CCAs.[175] Third, purchasers of CCAs frequently must train their employees on how to use new CCAs before those CCAs can be used.[176] The lack of substitute goods makes this market susceptible to collusion.

### b.    CCAs Are a Necessity

151.    CCAs are perceived by purchasers as providing economic, commercial, and environmental benefits to the cement, concrete, and mortars that incorporate them. They are therefore viewed as essential to projects involving concrete, cement, and/or mortar.[177]

152.    Purchasers of CCAs are thus unable to respond to price increases by buying less.

153.    Purchasers' need for CCAs also makes this market more susceptible to collusion.

---

[173] Id. at ¶¶ 53-64.

[174] Id. at ¶ 11.

[175] Id. at ¶ 51.

[176] Id. at ¶ 50.

[177]"Sika's product offering is…essential to their end users…" (VY Tyndall Global Select Fund Commentary, October 2019, p. 4); see also CMA, Provisional Findings Report at ¶ 6 .30-6.31 (Oct. 25, 2022).

### c.    CCAs Comprise a Small Share of the Cost of the Final Product

154.   CCAs often make up only about one percent (1%) to seven percent (7%) of the overall cost of the finished products in which they are used.[178]

155.   This also makes this market especially susceptible to collusion.

### H.    Defendants' Fraudulently Concealed Their Conduct

156.   Plaintiff had no knowledge of the Defendants' anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until, at the earliest, October 17, 2023, when the EC announced its investigation into the Defendants and that it was coordinating with the Turkish Competition Authority, the CMA, and the DOJ. As a result, Plaintiff did not discover, nor could it have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before that date. Prior to October 17th, 2023, there was insufficient information to suggest that the Defendants were involved in a conspiracy to fix prices for CCAs.

157.   Therefore, the statute of limitation on the claims asserted herein was tolled by fraudulent concealment until at least October 17, 2023. Defendants affirmatively and wrongfully concealed their anticompetitive conduct since the beginning of the Class Period.

158.   Defendants' conspiracy was inherently self-concealing. The success of the conspiracy depended on the Defendants and their co-conspirators keeping the price-fixing conduct alleged herein secret from customers and government authorities. Plaintiff reasonably believed it was purchasing CCAs in a competitive industry.

159.   Defendants and their co-conspirators also took affirmative steps to conceal the conspiracy and carry it out in a manner that would evade detection. For example, each Defendant

---

[178] CMA, Provisional Findings Report at ¶ 6.32 (Oct. 25, 2022).

has a "Code of Conduct" that appears to prohibit exactly the type of conduct they engaged in here.[179]

160.     Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed, Plaintiff did not learn or discover the operative facts giving rise to its claims until October 17, 2023. No information, actual or constructive, was ever made available to Plaintiff that would have led a reasonably diligent person to investigate whether a conspiracy in the market for CCAs existed prior to October 17, 2023.

161.     Moreover, because Plaintiff could not discover the existence of its claims prior to October 17, 2023, Plaintiff's claims did not accrue until that date.

## V.     CLASS ACTION ALLEGATIONS

162.     Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a) and (b)(2) seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities that purchased CCAs other than directly from Defendants or alleged co-conspirators, where the person or entity purchased in the United States during the Class Period.

163.     Plaintiffs also brings this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure, Rule 23(a) and (b)(3) seeking damages pursuant to antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following Class (the "Damages Class"):

---

[179] Sika, Code of Conduct (May 1, 2021), https://www.sika.com/content/dam/dms/corporate/v/glo-code-of-conduct.pdf; Saint-Gobain Group, General Principles of Conduct and Action, https://www.saint-gobain.com/sites/saint-gobain.com/files/principles_en.pdf; Master Builders Group, Code of Conduct, https://assets.master-builders-solutions.com/en-global/master%20builders%20solutions%20group%20code%20of%20conduct.pdf; RPM, The Values & Expectations of 168 (Apr. 2018), https://www.rpminc.com/media/2114/v_es_final_version_for_the_board_meeting_april_2018.pdf.

All persons and entities that purchased CCAs other than directly from Defendants or alleged co-conspirators, where the person or entity purchased in an Indirect Purchaser State[180] during the Class Period.

164.    The Nationwide Class and Damages Class are referred to collectively as the "Classes" unless otherwise indicated. Specifically excluded from the Classes are the Defendants, their parent companies, subsidiaries and affiliates, co-conspirators, federal government entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, the Court, and persons who purchased CCAs directly from Defendants.

165.    ***Numerosity.*** While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in the Classes. Joinder is therefore impracticable.

166.    ***Commonality.*** Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of the Defendants' conspiracy, which was generally applicable to all the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a.    Whether the Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of CCAs sold in the United States;

b.    The identity of the participants of the alleged conspiracy;

---

[180] The "Indirect Purchaser States" as listed below in Counts II, III, and IV are: Arizona, Arkansas, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

c.     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.     Whether the alleged conspiracy violated federal antitrust laws and/or state antitrust, unfair competition, and/or consumer protection laws, as alleged in the following Claims for Relief;

e.     Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the Class, thereby entitling Plaintiffs and Class Members to disgorgement of all benefits derived by Defendants, as alleged in the following Claims for Relief.

f.     Whether the conduct of the Defendants and their co-conspirators, as alleged in this Consolidated Amended Complaint, caused injury to the business or property of Plaintiffs and Class Members;

g.     The effect of the alleged conspiracy on the prices of CCAs sold in the United States during the Class Period;

h.     Whether Plaintiffs and the Class Members had any reason to know or suspect the conspiracy, or any means to discovery the conspiracy;

i.     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and Class Members;

j.     The appropriate class-wide measure of damages for the Class.

167.   *Typicality.* Plaintiffs' claims are typical of the claims of Class Members, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all Class Members are similarly affected by the Defendants' wrongful conduct in that they paid artificially

inflated prices for CCAs purchased other than directly from the Defendants or their co-conspirators.

168.   *Adequacy.* Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

169.   *Predominance.* The questions of law and fact common to the Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

170.   *Superiority.* Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single form simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

171.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

## VI.   INTERSTATE TRADE AND COMMERCE

172.    Billions of dollars of transactions in CCAs are entered into each year in interstate commerce in the United States and the payments for those transactions flowed in interstate commerce.

173.    Defendants' conspiracy had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

174.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for CCAs in the United States.

175.    Defendants' unlawful conduct has a direct and adverse impact on competition in the United States. Absent Defendants' conspiracy to fix the prices of CCAs sold in the United States, the prices of CCAs would have been determined by a competitive, efficient market.

## VII.   ANTITRUST INJURY

176.    Defendants' antitrust conspiracy had the following effects, among others:

    a.    Price competition has been restrained or eliminated with respect to the pricing of CCAs;

    b.    The prices of CCAs have been fixed, raised, maintained, or stabilized at artificially inflated levels;

    c.    Purchasers of CCAs have been deprived of the benefits of free and open competition; and

    d.    Purchasers of CCAs paid artificially inflated prices.

177.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize and/or maintain the price of CCAs.

178.   The precise amount of the overcharge impacting the prices of CCAs paid by Plaintiff and the Class can be measured and quantified using well-accepted models.

179.   By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for CCAs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CAUSES OF ACTION

## COUNT I

## Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)

## (Conspiracy in Restraint of Trade)

180.   Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

181.   From at least May 11, 2018, until the effects of their unlawful conduct cease, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy with regards to CCAs in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

182.   The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially high levels the prices they charged for CCAs in the United States.

183.   In formulating and effectuating this conspiracy, on information and belief, Defendants and their co- conspirators did those things that they combined and conspired to do, including the following:

a.      exchanging competitively sensitive information among themselves, with the aim to fix, increase, maintain, or stabilize prices of CCAs in the United States;

b.      participating in meetings and conversations among themselves during which they agreed to fix, increase, maintain, or stabilize prices of CCAs a in the United States; and

c.      participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached.

184.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, raise, or stabilize prices of CCAs.

185.   Defendants' conspiracy had the following effects, among others:

a.      Price competition in the market for CCAs has been restrained, suppressed, and/or eliminated;

b.      Prices for CCAs provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

c.      Plaintiff and members of the Class who purchased CCAs from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

186.   Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for CCAs purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

187.   The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

188.   Plaintiff and members of the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**COUNT II**

**<u>Violations of the State Antitrust Statutes</u>**

189.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

190.   During the Class Period, Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of CCAs in unreasonable restraint of trade in commerce, in violation of the various state antitrust statutes set forth below.

191.   Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for CCAs.

192.   As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated Indirect Purchasers in the Damages Class who purchased CCAs have been harmed by being forced to pay artificially-inflated, supracompetitive prices for CCAs.

193.   By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws pleaded below.

194.   **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Ariz. Rev. Stat. §§ 44-1402, *et seq.*** with respect to purchases of CCAs in Arizona by Class members and/or purchases by Arizona residents.

a.   Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout

Arizona; (2) CCA prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1402, *et seq.*

195. **California**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Cal. Bus. And Prof. Code, §§ 16720, *et seq.*** with respect to purchases of CCAs in California by Class members and/or purchases by California residents.

a. During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of CCAs at supracompetitive levels.

b. The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful

59

trust and concert of action among the Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of CCAs.

c.  For the purpose of forming and effectuating the unlawful trust, the Defendants have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) fixing, raising, stabilizing, and pegging the price of CCAs.

d.  The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition in the sale of CCAs has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for CCAs sold by Defendants have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased CCAs other than directly from Defendants have been deprived of the benefit of free and open competition.

e.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property in that they paid more for CCAs than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

196. **Connecticut**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Conn. Gen. Stat. Ann. §§ 35-26, *et seq.*** with respect to purchases of CCAs in Connecticut by Class members and/or purchases by Connecticut residents.

    a.    Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Connecticut; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

    b.    During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. Ann. §§ 35-26, *et seq.* Accordingly, members of the Damages Class seek all forms of relief available under Conn. Gen. Stat. Ann. §§ 35-26, *et seq.*

197. **District of Columbia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **D.C. Code Ann. §§ 28-4502, *et seq.*** with respect to purchases of CCAs in the District of Columbia by Class members and/or purchases by District of Columbia residents.

a.   Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.   During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4502, *et seq*. Accordingly, members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4502 *et seq*.

198.   **Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **740 Ill. Comp. Stat. Ann. 10/1, *et seq*.** with respect to purchases of CCAs in Illinois by Class Members and/or purchases by Illinois residents.

a.   Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Illinois; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Damages

Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.   During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. Ann. 10/1, *et seq*. Accordingly, members of the Damages Class seek all forms of relief available under 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

199.   **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Iowa Code §§ 553.4, *et seq.*** with respect to purchases of CCAs in Iowa by Class Members and/or purchases by Iowa residents.

a.   Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Iowa; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.   During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.4, *et seq.* Accordingly, members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.4, *et seq.*

200.    **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Kan. Stat. Ann. §§ 50-101, *et seq.*** with respect to purchases of CCAs in Kansas by Class members and/or purchases by Kansas residents.

a.    Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Kansas; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*

Accordingly, members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

201.   **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Me. Rev. Stat. Ann. 10 §§ 1101, *et seq.*** with respect to purchases of CCAs by Class members and/or purchases by Maine residents.

       a.     Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Maine; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

       b.     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

       c.     As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

       d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. Ann. 10, §§ 1101, *et seq*. Accordingly, members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*

202.   **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Mich. Comp. Laws Ann. §§ 445.772, *et seq.*** with respect to purchases of CCAs in Michigan by Class members and/or purchases by Michigan residents.

a.    Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Michigan; (2) CCA prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices CCAs.

b.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

c.    As a direct and proximate result of Defendants' conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreement in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.772, *et seq*. Accordingly, members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.772, *et seq.*

203.   **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Minn. Stat. §§ 325D.51, *et seq.*** with respect to purchases of CCAs in Minnesota by Class members and/or purchases by Minnesota residents.

a.    Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) CCA prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) members of the Damages

Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.51, *et seq.* Accordingly, members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.51, *et seq.*

204.   **Mississippi**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Miss. Code Ann §§ 75-21-3, *et seq.*** with respect to purchases of CCAs in Mississippi by Class members and/or purchases by Mississippi residents.

a.     Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

67

c.      As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-3, *et seq.* Accordingly, members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-3, *et seq.*

205.   **Nebraska**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Neb. Code Ann. §§ 59-801, *et seq.*** with respect to purchases of CCAs in Nebraska by Class members and/or purchases by Nebraska residents.

a.      Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.      During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et*

*seq*. Accordingly, members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

206.   **Nevada**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **Nev. Rev. Stat. Ann. §§ 598A.060,** *et seq.* with respect to purchases of CCAs in Nevada by Class members and/or purchases by Nevada residents.

a.   Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated through Nevada; (2) CCA prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.   During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

e.   During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

f.      As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

g.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.060, *et seq*. Accordingly, members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.060, *et seq.*

207.   **New Hampshire**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.H. Rev. Stat. Ann. §§ 356.2,** *et seq.,* with respect to purchases of CCAs in New Hampshire by Class members and/or purchases by New Hampshire residents.

a.      Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially throughout New Hampshire, (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.      During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

   d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356.2, *et seq*. Accordingly, members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:2, *et seq.*

208. **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.M. Stat. Ann. §§ 57-1-1, *et seq.*** with respect to purchases of CCAs in New Mexico by Class members and/or purchases by New Mexico residents.

   a. Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially inflated prices for CCAs.

   b. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

   c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

   d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. S§ 57-1-1, *et seq.* Accordingly, members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

209. **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.Y. Gen. Bus. L. §§ 340, *et seq.*** with respect to purchases of CCAs in New York by Class members and/or purchases by New York residents.

a.     Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout New York; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs, or purchased products that were otherwise of lower quality than they would have been absent the conspirators illegal acts, or were unable to purchase products that they otherwise would have purchased absent the illegal conduct.

b.     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act §§ 340, *et seq.* The conduct set forth above is a per se violation of the Act. Accordingly, members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

210.   **North Carolina**: Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.C. Gen. Stat. §§ 75-1, *et seq.*** with respect to purchases of CCAs in North Carolina by Class members and/or purchases by North Carolina residents.

a.      Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.      During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c.      As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

211.   **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.D. Cent. Code §§ 51-08.1-01, *et seq.*** with respect to purchases of CCAs in North Dakota by Class members and/or purchases by North Dakota residents.

a.      Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) members of the

Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08/1-01, *et seq*. Accordingly, members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

212. **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Or. Rev. Stat. §§ 646.705,** *et seq.,* with respect to purchases of CCAs in Oregon by Class members and/or purchases by Oregon residents.

a. Defendants' combination and conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Oregon; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

213.     **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **R.I. Gen. Laws §§ 6-36-4,** *et seq.* with respect to purchases of CCAs in Rhode Island by Class members and/or purchases by Rhode Island residents.

a.     Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.     During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-4, *et seq*. Accordingly, members of the Damages Class seek all forms of relief available under R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

214.  **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **S.D. Codified Laws An.. §§ 37-1, *et seq.*** with respect to purchases of CCAs in South Dakota by Class members and/or purchases by South Dakota residents.

a.      Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) CCA prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws An. §§ 37-1, *et seq*. Accordingly, members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

215.    **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Tenn. Code Ann. §§ 47-25-101, *et seq.*** with respect to purchases of CCAs in South Dakota by Class members and/or purchases by South Dakota residents.

a.      Defendants' combination or conspiracy had the following effects: (1) CCAs price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) CCAs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

c.      As a direct and proximate cause of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

216. **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Utah Code Ann. §§ 76-10-3101, *et seq*.** with respect to purchases of CCAs in Utah by Class members and/or purchases by Utah residents.

a. Defendants' combination or conspiracy had the following effects: (1) CCAs price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) CCAs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

c. As a direct and proximate cause of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq.* Accordingly, members of the Damages Class seek all relief available under Utah Code Ann. §§ 76-10-3101, *et seq.*

217.    **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Vt. Stat. Ann. 9 §§ 2453, *et seq.*** with respect to purchases of CCAs by Class members and/or purchases by Vermont residents.

      a.    Defendants' combination or conspiracy had the following effects: (1) CCAs price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) CCAs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

      b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

      c.    As a direct and proximate cause of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, members of the Damages Class seek all relief available under Vermont Stat. Ann. §§ 2453, *et seq*.

218.    **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **W. Va. Code §§ 47-18-4, *et seq.*** with respect to purchases of CCAs in West Virginia by Class members and/or purchases by West Virginia residents.

a.   Defendants' combination or conspiracy had the following effects: (1) CCAs price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) CCAs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b.   During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c.   As a direct and proximate cause of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.* Accordingly, members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

219.   **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Wis. Stat. §§ 133.01,** *et seq.* with respect to purchases of CCAs in Wisconsin by Class members and/or purchases by Wisconsin residents.

a.   Defendants' combination or conspiracy had the following effects: (1) CCAs price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) CCAs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the

Damages Class were deprived of free and open competition; and (4) members of the Damages Class paid supracompetitive, artificially inflated prices for CCAs.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c. As a direct and proximate cause of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

## COUNT III

### Violations of State Consumer Protection Law

220.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

221.   During the Class Period, Defendants engaged in unfair or deceptive acts or practices in violation of the state deceptive trade practices and consumer protection laws pleaded below.

222.   **Arkansas:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Ark. Code Ann. § 4-88-107(a)(10)** with respect to purchases of CCAs in Arkansas by Class members and/or purchases by Arkansas residents.

a. Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Arkansas commerce.

c. As a direct and proximate cause of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have engaged om unfair or deceptive acts of practices in violation of Ark. Code Ann. § 4-88-107(a)(10). Accordingly, members of the Damages Class seek all relief available under Ark. Code Ann. § 4-88-107(a)(10).

223. **California:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Cal. Bus. & Prof. Code § 17200,** *et seq.* with respect to purchases of CCAs in California by Class members and/or purchases by California residents.

a. Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on California commerce.

c. As a direct and proximate cause of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have engaged om unfair or deceptive acts of practices in violation of Cal. Bus. & Prof. Code § 17200,

*et seq.* Accordingly, members of the Damages Class seek all relief available

under Cal. Bus. & Prof. Code § 17200, *et seq.*

224. **Illinois:** Defendants have engaged in unfair or deceptive acts or practices in violation of **815 Ill. Comp. Stat. Ann. 505/10a,** *et seq.* with respect to purchases of CCAs in Illinois by Class members and/or purchases by Illinois residents.

    a.    Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

    b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Illinois commerce.

    c.    As a direct and proximate cause of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants have engaged om unfair or deceptive acts of practices in violation of 815 Ill. Comp. Stat. Ann. 505/10a, *et seq.* Accordingly, members of the Damages Class seek all relief available under 815 Ill. Comp. Stat. Ann. 505/10a, *et seq.*

225. **Minnesota:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Minn. Stat. § 325F.68,** *et seq.* with respect to purchases of CCAs in Minnesota by Class members and/or purchases by Minnesota residents.

    a.    Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Minnesota commerce.

c.  As a direct and proximate cause of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have engaged om unfair or deceptive acts of practices in violation of Minn. Stat. § 325F.68, *et seq.* Accordingly, members of the Damages Class seek all relief available under Minn. Stat. § 325F.68, *et seq.*

226.  **New Mexico:** Defendants have engaged in unfair or deceptive acts or practices in violation of **N.M. Stat. Ann. § 57-12-3,** *et seq.* with respect to purchases of CCAs in New Mexico by Class members and/or purchases by New Mexico residents.

a.  Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on New Mexico commerce.

c.  As a direct and proximate cause of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have engaged om unfair or deceptive acts of practices in violation of N.M. Stat. Ann. § 57-12-3, *et seq.*

Accordingly, members of the Damages Class seek all relief available under N.M. Stat. Ann. § 57-12-3, *et seq.*

227. **North Carolina:** Defendants have engaged in unfair or deceptive acts or practices in violation of **N.C. Gen. Stat. § 75-1.1, *et seq.*** with respect to purchases of CCAs in North Carolina by Class members and/or purchases by North Carolina residents.

    a.    Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

    b.    During the Class Period, Defendants' illegal conduct had a substantial effect on North Carolina commerce.

    c.    As a direct and proximate cause of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants have engaged om unfair or deceptive acts of practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.* Accordingly, members of the Damages Class seek all relief available under N.C. Gen. Stat. § 75-1.1, *et seq.*

228. **South Carolina:** Defendants have engaged in unfair or deceptive acts or practices in violation of **S.C. Code Ann. § 39-5-10, *et seq.*** with respect to purchases of CCAs in South Carolina by Class members and/or purchases by South Carolina residents.

    a.    Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

c.  As a direct and proximate cause of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have engaged om unfair or deceptive acts of practices in violation of S.C. Code Ann. § 39-5-10, *et seq*. Accordingly, members of the Damages Class seek all relief available under S.C. Code Ann. § 39-5-10, *et seq.*

229.  **Vermont:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Vt. Stat. Ann. Tit. 9, § 2453, *et seq.*** with respect to purchases of CCAs in Vermont by Class members and/or purchases by Vermont residents.

a.  Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

c.  As a direct and proximate cause of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have engaged in unfair or deceptive acts of practices in violation of Vt. Stat. Ann. Tit. 9, § 2453, *et seq.*

Accordingly, members of the Damages Class seek all relief available Vt. Stat. Ann. Tit. 9, § 2453, *et seq.*

230.   **Wisconsin:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Wisc. Stat. § 100.18,** *et seq.* with respect to purchases of CCAs in Wisconsin by Class members and/or purchases by Wisconsin residents.

    a.   Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

    b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

    c.   As a direct and proximate cause of the Defendants' unlawful conduct, members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have engaged om unfair or deceptive acts of practices in violation of Wisc. Stat. § 100.18, *et seq.* Accordingly, members of the Damages Class seek all relief available Wisc. Stat. § 100.18, *et seq.*

### COUNT IV

### Unjust Enrichment[181]

231.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

---

[181] Unjust enrichment claims are alleged herein under the laws of the following states: Arizona, Arkansas, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

232.   To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

233.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of CCAs.

234.   Defendants have benefitted from their unlawful acts and it would inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the Class Members for CCAs.

235.   Plaintiffs and the Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the Class Members are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Class may make claims on a pro rata basis.

236.   Pursuit of any remedies against the firms from whom Plaintiffs and the Class purchased CCAs subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Classes respectfully request the following relief:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as representative of the Class and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.      The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a per se violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

C.      The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination allege herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.      That each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and F. That the Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: December 5, 2023

Respectfully submitted,

By:   */s/ Lee Albert*
Lee Albert (PA Bar No. 046852)
**GLANCY PRONGAY & MURRAY LLP**
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
lalbert@glancylaw.com

Blaine Finley*
Lissa Morgans*
Cody McCracken*
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., NW
Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
bfinley@cuneolaw.com
lmorgans@cuneolaw.com
cmccracken@cuneolaw.com

Jon A. Tostrud*
Anthony Carter*
**TOSTRUD LAW GROUP, P.C.**
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Telephone: (310) 278-2600
jtostrud@tostrudlaw.com
acarter@tostrudlaw.com

*pro hac vice* forthcoming